# In the United States Court of Federal Claims

No. 15-155T
(Filed:  March 22, 2018)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ALTERNATIVE CARBON RESOURCES, LLC,

          Plaintiff,

v.

THE UNITED STATES,

          Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Cross-Motions for Summary Judgment; RCFC 56; I.R.C. §§ 6426, 6427, 6675; Alternative Fuel Mixture Credit; Alternative Fuel; Sale; Use as a Fuel; Substance-Over-Form Doctrine; Economic Substance Doctrine; Excessive Claim Penalty

William Sidney Smith, Des Moines, IA, for plaintiff.

Miranda Bureau, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

The parties in this case dispute the propriety of nearly $20 million in refundable alternative fuel mixture credits that plaintiff Alternative Carbon Resources, LLC claimed in 2011 pursuant to section 6426(e) of the Internal Revenue Code ("I.R.C."). After plaintiff claimed the credits, the Internal Revenue Service ("IRS") determined that plaintiff did not quality for them and thus sought to recover the payments it made to plaintiff, along with various penalties and interest. Currently before the court are the parties' cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). As explained below, plaintiff was not entitled to the alternative fuel mixture credits, but is liable for one of the penalties assessed by the IRS. Accordingly, the court grants in part and denies in part plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment.

## I.  BACKGROUND

### A.  Statutory and Regulatory Context

Congress enacted the initial version of I.R.C. § 6426 in 2004. See American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 301(a), 118 Stat. 1418, 1459-61 (codified as amended at I.R.C. § 6426 (2006)). The statute initially provided credits for the production of alcohol fuel mixtures and biodiesel mixtures. Id. The credits for alternative fuels and alternative

fuel mixtures were added the following year.  See Safe, Accountable, Flexible, Efficient Transportation Equity Act:  A Legacy for Users, Pub. L. No. 109-59, § 11113(b)(2), 119 Stat. 1144, 1947-48 (2005).  With exceptions not relevant here, the new credits were available from October 1, 2006, through September 30, 2009.  Id. § 11113(b)(2), (d).  At the time, the alternative fuel credits were expected to cost approximately $265 million over five years.  Joint Comm. on Taxation, Description of Revenue Provisions Contained in the President's Fiscal Year 2010 Budget Proposal (Sept. 2009), JCS-3-09 No. 3 ("Revenue Raising Proposals"), at 30. I.R.C. § 6426 was further amended multiple times over the ensuing years.  Relevant to the instant dispute are the 2008 and 2010 amendments.

In 2008, Congress extended the sunset date for the alternative fuel and alternative fuel mixture credits to December 31, 2009.  Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, § 204(a), 122 Stat. 3765, 3834.  Despite the initial budget projections, over $2.5 billion in cash payments was claimed in the first six months of 2009 for "liquid fuel derived from biomass"—one of several types of eligible substances.  Revenue Raising Proposals 30.  The "bulk" of the $2.5 billion was paid to paper manufacturers using a substance known as "black liquor" as a fuel source for paper mills, which had been a "decades-long practice" in the industry. Id.  Due to what was perceived by many as a "windfall" to paper manufacturers "for simply continuing a practice they have engaged in for more than 70 years," the President's budget for the 2010 fiscal year proposed to make black liquor mixtures ineligible for the alternative fuel mixture credit.  Id. at 29-30.

On March 12, 2010—prior to the 2010 amendment to I.R.C. § 6426—the IRS Office of Chief Counsel released a memorandum discussing the application of the alternative fuel mixture credit in I.R.C. § 6426(e) to black liquor.  See generally App. Supp. Pl.'s Mot. Summ. J. ("Pl.'s App.") 490-94 (containing IRS Chief Counsel Memorandum AM2010-001 (Mar. 12, 2010), 2010 WL 890956).[1]  Black liquor is "a byproduct of the paper milling process in kraft mills."[2] Id. at 490.  It is an "aqueous solution" composed of wood chips (which consist of water and wood), process water, and dissolved inorganic solids.  Id. at 490-92.  The wood chips are biomass—i.e., "any organic material other than (A) oil and natural gas (or any product thereof), and (B) coal (including lignite) or any product thereof," I.R.C. § 45K(c)(3)—but the process water and inorganic solids are not.  Pl.'s App. 492.  Black liquor is converted to heavy black liquor by removing much of the chip water and process water, resulting in a mixture that is a "molasses-like consistency" comprised of "approximately 60 percent dissolved solids and 40 percent water, by volume."  Id. at 491.  The heavy black liquor is then mixed with diesel fuel and

---

[1]  The appendix in support of plaintiff's motion for summary judgment was filed in two volumes and is consecutively paginated.  The first volume, pages 1 through 185, was filed at ECF No. 39-2 as an attachment to plaintiff's motion for summary judgment.  The second volume, pages 186 through 497, was filed at ECF No. 41-1 as an attachment to plaintiff's reply in support of its motion and response to defendant's cross-motion for summary judgment.

[2]  "To make black liquor, wood chips from debarked tree logs are pulped by using inorganic pulping chemicals . . . , process water, heat, and pressure to separate lignin and other components of the wood from the cellulose fibers in the wood chips . . . ."  Pl.'s App. 490.

fed into a recovery boiler, where steam is generated that is used to produce electricity and the inorganic solids are converted into smelt.  Id.  Although the chemical transformation of the inorganic solids into smelt "consumes energy in the recovery boiler," the entire process "results in a net production of energy."  Id.  Therefore, the author of the memorandum concluded, "the entire volume of the <u>heavy</u> black liquor is a liquid fuel that is 'derived from' biomass" because (1) the processing of black liquor into heavy black liquor "significantly reduces the amount of water in the liquid fuel" and (2) if heavy black liquor were a taxable fuel its entire volume would be taxable "without taking into account its component parts."  Id. at 493 (emphasis added).

The 2010 amendments to I.R.C. § 6426, which were approved on December 17, 2010, revived the alternative fuel and alternative fuel mixture credits through December 31, 2011, provided a one-time opportunity to retroactively claim the credits for the 2010 calendar year, and specifically excluded black liquor—defined as "any fuel (including lignin, wood residues, or spent pulping liquors) derived from the production of paper or pulp"—from the definition of alternative fuel.  Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010 ("Act of 2010"), Pub. L. No. 111-312, § 704, 124 Stat. 3296, 3311.

Thus, in 2011, the credits were available as follows:

> **(d)  Alternative fuel credit.**—
>
> > **(1)  In general.**—For purposes of this section, the alternative fuel credit is the product of 50 cents and the number of gallons of an alternative fuel . . . sold by the taxpayer for use as a fuel in a motor vehicle or motorboat, sold by the taxpayer for use as a fuel in aviation, or so used by the taxpayer.
> >
> > . . . .
> >
> > **(5)  Termination.**—This subsection shall not apply to any sale or use for any period after December 31, 2011 . . . .
>
> **(e)  Alternative fuel mixture credit.**—
>
> > **(1)  In general.**—For purposes of this section, the alternative fuel mixture credit is the product of 50 cents and the number of gallons of alternative fuel used by the taxpayer in producing any alternative fuel mixture for sale or use in a trade or business of the taxpayer.
> >
> > **(2)  Alternative fuel mixture.**—For purposes of this section, the term "alternative fuel mixture" means a mixture of alternative fuel and taxable fuel . . . which—

> **(A)** is sold by the taxpayer producing such mixture to any person for use as a fuel, or
>
> **(B)** is used as a fuel by the taxpayer producing such mixture.
>
> **(3) Termination.**—This subsection shall not apply to any sale or use for any period after December 31, 2011 . . . .

I.R.C. § 6426. Many of the terms used in the statute had specific meanings. As relevant here, "alternative fuel" was "liquid fuel derived from biomass." Id. § 6426(d)(2). "Liquid fuel" was not defined in the I.R.C., but was defined by the United States Energy Information Administration as "combustible or energy-generating molecules that can be harnessed to create mechanical energy, usually producing kinetic energy[, and that] must take the shape of their container."[3] Def.'s App. 226.[4] "Taxable fuel" included gasoline, diesel fuel, or kerosene. I.R.C. § 4083(a)(1). An "alternative fuel mixture" required "at least 0.1 percent (by volume) of taxable fuel" to be mixed with an alternative fuel. IRS Notice 2006-92, § 2(b), 2006-2 C.B. 774. An alternative fuel mixture was "used as a fuel when . . . consumed in the production of energy," but not when "destroyed in a fire or other casualty loss." Id. § 2(f)(1). An alternative fuel mixture was "sold . . . for use as a fuel" when the producer selling the mixture "ha[d] reason to believe that the mixture [would] be used as a fuel either by the person buying the mixture from the producer or by any later buyer of the mixture." Id. § 2(f)(2). Further, with respect to excise taxes, a "sale" was "an agreement whereby the seller transfers the property (that is, the title or the substantial incidents of ownership) in goods to the buyer for a consideration called the price, which may consist of money, services, or other things." Treas. Reg. § 48.0-2(a)(5) (2010); accord Sale, Black's Law Dictionary (10th ed. 2014) (defining "sale" as the "transfer of property or title for a price"). Finally, a taxpayer was required to register with the IRS to be eligible for the credits. I.R.C. § 6426(a); IRS Notice 2006-92, § 4(b).

In short, a taxpayer could qualify for the alternative fuel mixture credit in 2011 by blending liquid fuel derived from biomass and at least 0.1% diesel fuel into a mixture that was used or sold for use as a fuel, provided that the taxpayer was properly registered. See IRS Notice 2006-92, § 4(b); Pl.'s App. 86. Taxpayers satisfying all of the requirements for claiming the alternative fuel mixture credit could receive the credit as either (1) a credit against excise tax liability by filing Form 720, Quarterly Federal Excise Tax Return, (2) a payment by filing Form

---

[3] There are several forms of kinetic energy, one of which is electric kinetic energy—i.e., electricity. App. to Def.'s Cross-Mot. Summ. J. & Opp'n to Pl.'s Mot. Summ. J. ("Def.'s App.") 221-23.

[4] The appendix to defendant's cross-motion for summary judgment and opposition to plaintiff's motion was filed in two volumes and is consecutively paginated. The first volume, pages 1 through 399, was filed at ECF No. 40-1 as an attachment to defendant's cross-motion for summary judgment. The second volume, pages 400 through 423, was filed at ECF No. 42-1 as an attachment to defendant's reply in support of its cross-motion for summary judgment.

8849, Claim for Refund of Excise Taxes, or (3) a credit against income tax liability by filing Form 4136, Credit for Federal Tax Paid on Fuels.[5]  I.R.C. §§ 34, 6426(a), (d)-(e), 6427(e), (k); IRS Notice 2006-92, § 4(b).  Any payments made under I.R.C. § 6427 were treated as refunds of overpayment of tax for all purposes, including assessing penalties and interest, and the IRS retained the same examination authority with respect to such payments as it did with tax liabilities generally.  I.R.C. § 6427(j).  Claims for such payments of an excessive amount— defined as the excess of the claimed amount over the allowable amount—were subject to a civil penalty of 200% of the excessive amount unless the taxpayer could demonstrate "reasonable cause" for making the claims.  Id. § 6675.

Taxpayers were required to apply for registration by submitting Form 637, Application for Registration (For Certain Excise Tax Activities), to the IRS.  Treas. Reg. § 48.4101-1(e); IRS Notice 2006-92, § 5(a).  A registration would not be issued to an "ultimate vendor" unless the IRS determined that the applicant and all related parties were current on their federal taxes and that (among other requirements) the applicant was, "in the course of its trade or business, regularly engaged . . . in the characteristic activity of a [blender]" or was "likely to be [so engaged] within a reasonable time after becoming registered."  Treas. Reg. § 48.4101-1(c)(1)(i), (f)(1)(ii), f(2); accord IRS Notice 2006-92, § 5(b).  The IRS was authorized, but not required, to conduct further inquiries (including site visits "without advance notice") regarding an application.  Treas. Reg. § 48.4101-1(g)(1).  Upon determining that an applicant met all of the prerequisites, the IRS was required to issue a letter of registration.  Id. § 48.4101-1(g)(3).  A letter of registration was valid until revoked or suspended.  Id. § 48.4101-1(a)(2).

On August 19, 2011, the IRS released a Chief Counsel Advisory ("CCA") discussing the alternative fuel and alternative fuel mixture credits.  See generally Pl.'s App. 83-88 (containing IRS Chief Counsel Advisory 201133010 (July 12, 2011), 2011 WL 3636293).  The author of the CCA noted that "[i]f a particular substrate qualifies as an alternative fuel . . . , the addition of 0.1 percent taxable fuel to the substrate may create an alternative fuel mixture."  Id. at 86.  The author then opined that "use of [an alternative fuel] mixture in the anaerobic digestion process does not constitute use as a fuel[] because the mixture is not consumed in the production of energy," and explained that "[t]he digester used in the anaerobic digestion process does not produce energy [and] is merely a location where certain chemical reactions occur to generate biogas."  Id.  Therefore, the author concluded, such a mixture was "not eligible for the alternative fuel mixture credit."  Id. at 88.

Congress revived the alternative fuel and alternative fuel mixture credits on January 2, 2013, making the credits available through December 31, 2013, and retroactively making the credits available for the 2012 calendar year (similar to the Act of 2010's retroactive treatment with respect to the 2010 calendar year).  American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 412, 126 Stat. 2313, 2343 (2013).  On December 19, 2014, the credits were extended

---

[5]  The distinction between payments and credits in this case is immaterial (except with respect to the excessive claim penalties, see infra Part IV) because the requirements and amounts are the same.  See I.R.C. § 6427(e)(1).  A payment is not available under I.R.C. § 6427(e)(1) when a credit is allowed under I.R.C. § 6426(e) based on the same amounts.  Id. § 6427(e)(3).

through December 31, 2014.  Tax Increase Prevention Act of 2014, Pub. L. No. 113-295, § 160, 128 Stat. 4010, 4022.  On December 18, 2015, the credits were extended through December 31, 2016.  Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 192(a)(1), 129 Stat. 2242, 3075 (2015).  The current version of I.R.C. § 6426 was enacted on February 9, 2018, and retroactively extended the credits through December 31, 2017.  Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 40415, 132 Stat. 64, 152.

### B. Plaintiff Investigates the Feasibility of Alternative Energy Tax Credits

In early 2010, while working to "economically produce volatile gases that could be burned to create energy," James Huyser and Jeffrey Carter began investigating the feasibility of an enterprise that would "convert the waste by-products from ethanol plants into useable alternative fuel."  Pl.'s App. 4, 18.  Messrs. Huyser and Carter both had extensive knowledge of the fuel industry in Iowa.  See id. at 14-16 (Huyser resume), 18 (discussing Mr. Carter's operation of a "waste-to-energy biofuel electric power plant").  They discussed their idea with officials from the Des Moines Wastewater Reclamation Authority ("WRA") and Greg Sanderson, a nationally recognized attorney specializing in energy tax credits who had worked with Mr. Carter on previous projects.  Id. at 18.  Mr. Huyser had asked his longtime local attorney, R. Jeffrey Lewis, to review Mr. Sanderson's background.  Id. at 3, 53-54.  Mr. Lewis informed Mr. Huyser that Mr. Sanderson appeared to be "a highly reputable individual in the tax area and probably as good an expert in the area of tax credits as [Mr. Huyser] was likely to find." Id. at 54; accord id. at 388 (Lewis Dep. 76:3-19) (describing Mr. Sanderson as an "expert on tax credits" whose opinion could be relied upon).

The enterprise contemplated by Messrs. Huyser and Carter involved the use of corn syrup (or other byproducts of ethanol and food plants) in anaerobic digesters.  Id. at 2.  Anaerobic digesters are used by wastewater treatment plants to produce methane, which is then used to produce energy and heat.  Id. at 92, 100, 105.  The process starts when substrates (or, more generally, feedstock)—substances that are typically "sludge" containing 10-20% solids—are placed in an anaerobic digester.[6]  Id. at 42 (Hare Dep. 11:2-18).  The anaerobic digester then breaks down "organic solids" through a process in which microbes eat the organic material, which produces methane (i.e., biogas) as a byproduct.  Id. at 41 (Hare Dep. 10:19-24).  The methane is then used in generators to produce electricity, in boilers to produce heat, or sold; any remaining methane is flared (i.e., burned off).  Id. at 43 (Hare Dep. 12:3-19); see, e.g., Def.'s App. 310-21 (WRA monthly digester reports).  Methane can also be cleaned and turned into compressed natural gas.  Pl.'s App. 281 (Sanderson Dep. 110:7-9).  Besides methane, the other byproduct of the anaerobic digestion process is a "dry cake-like substance," similar to dirt (i.e., biosolids), that is used on farm fields as fertilizer.  Id. at 42-43 (Hare Dep. 11:19-12:2); see also id. at 84 (defining "anaerobic digestion" as "a process [in] which microorganisms break down

---

[6]  A substrate is a "substance upon which an enzyme acts [and] may serve as a source of food for an organism."  Def.'s App. 228.  Feedstock is "[r]aw material [used] to supply or fuel a machine or industrial process."  Id. at 224.  Substances placed into anaerobic digesters are referred to as both substrate and feedstock throughout the record by different individuals.  The court will use the more general term, feedstock, in this opinion.

biodegradable material in the absence of oxygen"); Def.'s App. 219 (same).  Messrs. Huyser and Carter "both believed that the by-products from ethanol and food plants could substantially increase the useable energy produced by anaerobic digesters[,] allowing those operators to power their own businesses, sell the energy to others[,] and potentially power vehicles."  Pl.'s App. 2.

On May 17, 2010, Messrs. Huyser, Carter, and Sanderson held a telephone conference to discuss whether or not using corn syrup in an anaerobic digester would be eligible for tax incentives.  Id. at 3, 18-19.  At the time, there was "an excess" of corn syrup waste in the market.  Id. at 208 (Carter Dep. 47:1-6).  Mr. Sanderson indicated that he believed the idea had merit, and sent Messrs. Huyser and Carter a memorandum he had written in January 2009 that outlined the requirements for alternative energy credits.[7]  Id. at 3, 19.  Mr. Sanderson also recommended that a scientist should be consulted regarding their proposed process, particularly whether using corn syrup in an anaerobic digester constituted "use as a fuel."  Id. at 266 (Sanderson Dep. 91:9-20).

On May 19, 2010, Mr. Huyser formed plaintiff as a legal entity.  Id. at 4.  Plaintiff eventually had four members—Mr. Huyser, Mr. Carter, Ken Boyle, and Matthew Kinley.  Id. at 19, 27.  Messrs. Huyser and Carter each hold a degree in finance.  Id. at 14, 17.  Mr. Kinley holds a degree in accounting and a certified public accountant ("CPA") credential.  Id. at 24.  Mr. Boyle holds a Master of Business Administration degree.  Id. at 30.  All four have extensive business experience in the alternative energy industry.  See, e.g., id. at 14-16 (Huyser), 17-18 (Carter), 24-25 (Kinley), 30-31 (Boyle).

Plaintiff, through its members, continued to investigate the feasibility of its plan to produce, and obtain tax credits for, alternative fuel mixtures.  In the "middle part of 2010," plaintiff held discussions with anaerobic digestion facilities that were "potential clients for waste-to-energy fuels."  Id. at 187 (Huyer Dep. 26:21-24).  Additionally, besides conversations with Messrs. Lewis and Sanderson, plaintiff engaged accounting firms in the Des Moines area to ascertain whether its plan to convert biomass into energy via anaerobic digesters "met all the terms and conditions" of the "credits."  Id. at 187-88 (Huyer Dep. 26:25-27:20).

Moving forward, plaintiff hoped to eventually develop alternative fuel mixtures that would produce more energy and develop and sell compressed natural gas that could be used in vehicles, both of which would potentially provide a profit stream after the tax credits were no longer available.  Id. at 215-16 (Carter Dep. 78:18-79:8); see also id. at 218-19 (Carter Dep. 81:1-82:13) (discussing plans to "fuel all of [the] city vehicles off the digester gas"), 219-20 (Carter Dep. 82:14-83:14) (discussing plans to develop "the ideal digester []mixture" that would be profitable without tax credits), 228-29 (Carter Dep. 146:1-147:3) (discussing how wastewater plants generate their own electricity by using methane produced in a digester).

During one of their conversations, plaintiff advised Mr. Sanderson that it was negotiating contracts with customers, and that plaintiff would pay customers to take plaintiff's alternative fuel mixtures.  Id. at 271 (Sanderson Dep. 96:7-13).  Mr. Sanderson was aware that, since buyers of waste products also acquire an obligation to dispose of those products, it was a common

_____

[7] Mr. Sanderson's January 2009 memorandum is not in the record before the court.

industry practice for sellers to pay a "tipping fee" as part of a transaction. Id. (Sanderson Dep. 96:12-20). Mr. Sanderson orally advised plaintiff that "[i]t seemed straightforward" that its transactions would qualify as sales, and noted that he had "worked on other ethanol projects" where the IRS had determined that a tipping fee transaction "is a legitimate sale for ethanol excise tax credits." Id. at 272 (Sanderson Dep. 97:10-21); accord id. at 297 (Sanderson Dep. 147:17-18) ("[I]t's a transfer for consideration. That's a sale."). In other words, Mr. Sanderson advised, plaintiff's model "was a sale, regardless of who [paid] whom." Id. at 287 (Sanderson Dep. 117:7-12).

During the summer of 2010, Mr. Sanderson also reviewed short sample contracts and initial lab results for plaintiff, id. at 273 (Sanderson Dep. 100:2-101:3), and regularly fielded plaintiff's questions via electronic mail, id. at 290 (Sanderson Dep. 126:1-3). Mr. Sanderson also advised plaintiff to seek out customers that would be "generating electricity and generating heat" because the "ultimate purpose" of the alternative fuel mixture credit was "to generate energy." Id. at 296 (Sanderson Dep. 144:1-6). He was informed that plaintiff's customers would be using plaintiff's alternative fuel mixtures accordingly, but he lacked any further knowledge of plaintiff's customers' operations. Id. at 295-96 (Sanderson Dep. 143:15-144:18). In January 2011, Mr. Sanderson provided plaintiff with a copy of IRS Private Letter Ruling 9631012, which Mr. Sanderson described as the IRS Assistant Chief Counsel's approval of "these tipping fee transactions" as qualifying sales. Id. at 161.

### C. Plaintiff's Business Model

Ultimately, plaintiff developed a business model that involved three main steps. First, plaintiff would purchase feedstock from a supplier, and the feedstock would be picked up by a trucking company contracted by plaintiff. Id. at 302 (Sanderson Dep. 211:14-16); Def.'s App. 74 (Kinley Dep. 25:3-13). Next, the trucking company would add the required amount of diesel fuel to the load to create an alternative fuel mixture. Pl.'s App. 302 (Sanderson Dep. 211:14-16); Def.'s App. 74 (Kinley Dep. 25:3-13). Finally, the mixture would be delivered to the digester customer. Pl.'s App. 302 (Sanderson Dep. 211:14-16); Def.'s App. 74 (Kinley Dep. 25:3-13). The digester customer would "charge a processing fee to take the fuel." Pl.'s App. 302 (Sanderson Dep. 211:16); see also id. at 271-72 (Sanderson Dep. 96:24-97:4) (noting that this fee was known in the industry as a "tipping fee"). In addition, because Mr. Sanderson had advised plaintiff that it would "look better" if plaintiff charged its customers "anything," plaintiff would charge its customers various nominal amounts for the alternative fuel mixture. Id. at 309 (Sanderson Dep. 241:10-15); see infra Section I.G (discussing plaintiff's customer agreements).

To solicit customers, plaintiff identified anaerobic digesters that were creating energy using biogas, and would then try to "provide the correct fuel to [the digester facility] to meet their needs" using particular feedstock.[8] Pl.'s App. 233-34 (Boyle Dep. 21:23-22:10); accord id.

---

[8] Local digesters were required to be registered with the Iowa Department of Natural Resources; such registration lists were publicly available. Pl.'s App. 221 (Carter Dep. 119:22-25). There are currently "over 800 anaerobic digesters producing energy" throughout the United States. Id. at 106.

at 250-51 (Kinley Dep. 34:18-35:8).  Plaintiff would then obtain a feedstock sample from a potential supplier, have the sample tested in a lab, and then provide the results to the digester facility to see if the particular feedstock was feasible for use in one of its digesters.  Id. at 234 (Boyle Dep. 22:18-25).  For the lab work, plaintiff utilized the services of Dr. Daniel Zitomer beginning in March 2011.  Id. at 231 (Carter Dep. 257:13-14), 237 (Boyle Dep. 53:9-12); Def.'s App. 392-93.  After finding a feasible feedstock for a customer, plaintiff would purchase the feedstock, mix it with 0.1% taxable fuel, and "then sell or deliver that product to the anaerobic digester customer."  Pl.'s App. 240 (Boyle Dep. 72:20-25).  Plaintiff used "[t]hin-stillage, wheat starch, ground soy hulls, [and] crop oil" as feedstock in 2011.  Id. at 489.  "[A]pproximately 60%" of plaintiff's feedstock was "thin corn stillage (a [by]product of producing ethanol)."  Id. at 100; accord Def.'s App. 74 (Kinley Dep. 25:14-17) (describing plaintiff's primary feedstock as "thin stillage from ethanol plants").

Plaintiff's "long-term vision was to build the demand for the favorable feedstocks" as a result of its customers being able to "increase their power generation capacity" from plaintiff's alternative fuel mixtures.  Pl.'s App. 255 (Kinley Dep. 72:14-19).  The tax credit incentives allowed plaintiff's operation to be profitable while it was building demand for its alternative fuel mixtures.  Id. (Kinley Dep. 72:6-9).  Eventually, plaintiff's "goal" was to "be able to sell [its alternative fuel mixtures] all day every day [by] showing [customers] that [their] energy production ha[d] increased."  Id. at 222 (Carter Dep. 140:21-25).  Plaintiff also investigated building a compressed natural gas refueling station for automobiles, but was unable to obtain the necessary land use agreements.  Id. at 252 (Kinley Dep. 54:1-14).

### D.  Plaintiff Applies for Registration

In advance of beginning operations, plaintiff submitted Form 637 to the IRS to apply for registration.  See id. at 75.  Plaintiff applied for an "M" designation, id., which refers to "blenders of . . . alternative fuel mixtures," Form 637 at 3.  Plaintiff met with IRS Agent Kevin Kresic, who was processing plaintiff's application, to give "a PowerPoint presentation to tell him exactly what [plaintiff was] doing, who [plaintiff was] getting the fuel from[,] who it was going to[,] and then a little bit about the fuel itself" so that there would be "no misunderstandings" regarding plaintiff's operations.[9]  Pl.'s App. 190 (Huyer Dep. 30:8-18).  In other words, plaintiff wanted to ensure that Agent Kresic "had access to the rudimentary facts of [plaintiff's] business plan."  Id. at 194 (Huyser Dep. 45:13-18).

On July 13, 2010, upon the advice of Agent Kresic, Mr. Huyser amended the designation sought to "AL"—i.e., an "[a]lternative fueler that sells for use or uses alternative fuel as a fuel in a motor vehicle or motorboat."  Id. at 75; Form 637 at 2.  The next day, Mr. Sanderson advised Mr. Huyser that the proper designation for plaintiff's proposed activities was "AM"—i.e., an "[a]lternative fueler that produces an alternative fuel mixture that is sold for use or used in the alternative fueler's trade or business."  IRS Form 637 at 2; Pl.'s App. 75.  On July 15, 2010, Mr. Huyser contacted Agent Kresic to amend plaintiff's application accordingly.  Pl.'s App. 75.  Mr.

_____

[9]  The PowerPoint presentation referenced by Mr. Huyser, and by others at various intervals, is not in the record before the court.

Huyser recognized that plaintiff needed to be registered "before the . . . blending activities commence[d]." Id. Mr. Huyser emphasized to Agent Kresic that plaintiff planned to "blend[] the liquid fuel from biomass with taxable fuel and sell[] the mixture to a third party to use as a fuel in a process to manufacture methane gas." Id.

On August 27, 2010, plaintiff's application for an "M" designation was approved, and plaintiff's application for an "AM" designation was denied as unnecessary since plaintiff did not plan to submit claims for any then-available credits.[10] Id. at 76-77. On December 17, 2010, plaintiff reapplied for the "AM" designation by submitting another Form 637 and referring to the "approved file" that was already in the IRS's possession. Id. at 77; see also id. at 78-79 (containing the Form 637 submitted by plaintiff in December 2010). On its December 17, 2010 Form 637, plaintiff explained that it planned to "take possession of corn oil/syrup from a variety of ethanol companies," and would then "blend the corn oil/syrup with a portion of diesel fuel equal to 1/10 of 1%" before "sell[ing] this alternative liquid fuel mixture . . . to a variety[ ]of customers for fuel." Id. at 78. Plaintiff's application was approved on January 14, 2011, and plaintiff was issued a registration number containing both the "M" and "AM" designations. Id. at 80. The affirmative duties of registrants were listed in the approval notice:

> 1) Make deposits, file returns, and pay taxes required by the Internal Revenue Code and the regulations;
>
> 2) Keep records sufficient to show the registrant's tax liability . . . and payments or deposits of such liability;
>
> 3) Make all information reports required . . . ;
>
> 4) Make available for inspection on demand by the Internal Revenue Service during normal business hours records relevant to a determination of tax liability . . . ; and
>
> 5) Notify the IRS office in which you are registered of any change . . . in the information the registrant submitted in connection with its application for registration . . . within [ten] days after the change occurs.

Id. at 81.

---

[10] As Mr. Huyser explained, the alternative fuel mixture credit was not available in 2010. Pl.'s App. 188 (Huyer Dep. 27:21-25). The Act of 2010, which reinstated the credit after it had previously sunset on December 31, 2009, was not approved until December 17, 2010. 124 Stat. at 3311.

### E.  Plaintiff Begins Operations

After plaintiff obtained its registration approval notice, it began operations pursuant to its business model.  Id. at 8-9, 21.  Plaintiff produced four types of alternative fuel mixtures:

<u>Corn Syrup/Thin-Stillage</u>

Corn syrup waste can be produced in several ways.  Corn syrup can be an off-spec or out-of-date by-product from the food manufacturing industry or it can be generated from thin-stillage waste of ethanol production.  Thin-stillage is the most frequently used alternative fuel mixture by [plaintiff] and it is a valuable resource from which useful products such [as] fertilizer, animal feed, and in [plaintiff's] case a high quality biogas rich in methane can be recovered when processed in an anaerobic digester.  [Plaintiff's] digester customers report that as a methane biogas [feedstock], thin-stillage not only increases biogas production, it also works as a catalyst with other digester substrates such as manure and sludge.  After fermentation, the liquid portion of the slurry has 8-12% ethanol by weight.  Because ethanol boils at a lower temperature than water does, the ethanol can be separated by a process called []distillation.  Conventional distillation systems can produce ethanol at 92-95% purity.  The residual water is then removed using molecular sieves that selectively absorb the water from an ethanol/water vapor mixture, resulting in nearly pure ethanol (>99%).  The residual water and corn solids that remain after the distillation process are called "stillage."  This whole stillage is then centrifuged to separate the liquid (thin-stillage) from the solid fragments of the kernel (wet cake or distillers' grains).  Some of the thin-stillage (backset) is recycled to the beginning of the dry-grind process to conserve the water used by the facility.  The remaining thin-stillage passes through evaporators to remove a significant portion of the water to produce thickened syrup.  [Plaintiff] pays to acquire the thin-stillage and has the product tested by a [third-]party lab to ensure [plaintiff] understand[s] the specific chemical/biological characteristics of the material.  The lab reports are shared with prospective municipal and farm digester customers to ensure it meets their needs and/or needs customization.  [Plaintiff] is able to adjust the strength of the material.  The liquid biomass is blended with 1/10th of 1% of diesel and delivered to the fuel customers.

Food Wastes

Food processing companies generate significant amounts of spoilage and waste as part of . . . transporting food to processing facilities and converting raw food into packaged, market-ready food products for distribution.  A typical food processing plant . . . generates 10% to 40% of the incoming field tonnage as waste. . . . [Plaintiff], following testing[, ]acquires food wastes that test well . . . (most notably wheat starch and cheese whey).  The liquid biomass is blended with 1/10th of 1% of diesel and delivered to the fuel customers.

Biodiesel Wash Water and Soap Stocks

A by-product from biodiesel production includes washing of raw biodiesel and/or its various liquid biomass feed stocks. . . . [F]or every 100 L [of] biodiesel produced about 20 L of washing water is discharged. . . .  High content of degradable organic substances makes it a suitable source of carbon for microbiological processes . . . .  [Plaintiff] can adjust the strength of the [feedstock] according to the needs of the digester customer's operations.  The liquid biomass is blended with 1/10th of 1% of diesel and delivered to the fuel customers.

Engineered Alternative Fuel Mixture—BioBeast

[Plaintiff] leveraged industry research, actual operational results from digesters[,] and worked closely with its customers to develop a high strength [alternative fuel mixture] that specifically addressed the needs of its digester customers. . . .  [T]he [feedstock] has high volatile solids (85-90%), meaning [there] is not a great deal of effluent that needs to be disposed following digestion, rather the material is fully digested and converted to energy.  The [feedstock] is a proprietary alternative fuel mixture that includes ground soy hulls . . . , various liquid biomass [feedstock,] and xanthan gum [(]which hold[s] the solids in suspension[)]. . . .  Ground soy hulls are delivered to [plaintiff's] facilities . . . .  Custom liquids, xanthan gum, and crop oils are stored on-site and make up the key ingredients. . . .  Finally, the custom fuel is blended with diesel within IRS specifications and delivered to the digester customer.

Def.'s App. 406-07 (internal strikethroughs omitted); see also Pl.'s App. 223 (Carter Dep. 141:8-9) (noting that plaintiff worked with Dr. Zitomer to develop its own feedstock—BioBeast—that it could make from scratch), 236 (Boyle Dep. 52:2-5) (same).

Several of plaintiff's customers reported that "as a methane biogas [feedstock], corn syrup not only increases biogas production, but also works as a catalyst with other digester [feedstock]." Id. at 238-39 (Boyle Dep. 64:16-65:6).  BioBeast used corn syrup as its base and included other waste materials.  Id. at 224-25 (Carter Dep. 142:23-143:4).  Plaintiff believed that BioBeast could be groundbreaking because its customers would be able to "produce twice as much gas . . . in less amount of time" using their "existing infrastructure," allowing customers to make electricity more efficiently.  Id. at 225 (Carter Dep. 143:12-24).  By using "waste products . . . that were having a difficult time being disposed of," BioBeast also helped the environment. Id. at 225-26 (Carter Dep. 143:2-144:4).  As of May 3, 2011, plaintiff had "multiple clients" who were waiting on lab reports to "ensure the findings [met] their operational requirements in using [plaintiff's] engineered biomass in commercial digester production."  Def.'s App. 396.  Lab results indicated that BioBeast "worked beyond anybody's expectations."  Pl.'s App. 230-31 (Carter Dep. 256:24-257:12).

### F.  Plaintiff Seeks Advice

On January 21, 2011, immediately prior to beginning operations, Mr. Huyser sent an electronic-mail message to Mr. Sanderson (and copied Messrs. Lewis and Carter) to ensure that plaintiff was "do[ing] things in the correct way" with respect to the alternative fuel mixture credit.  Def.'s App. 335-36.  Mr. Huyser explained that plaintiff would be "buying the bio-diesel fuel and having the trucking company record the additions to each load of the .1 of 1% diesel fuel."  Id. at 335.  He also explained that, pending the approval of its first customer, the WRA, the consideration for plaintiff's sale of its alternative fuel mixture to the WRA was the "service provided by the WRA in disposing of the 'non-combustible materials,'" and that the WRA "[would] not be paying" for the alternative fuel mixture.  Id. at 335-36.  He further noted that plaintiff would be "charg[ed] a fee . . . for disposing of the 'non-combustible' materials."  Id. at 336.  In addition, he asked (among other questions) whether Agent Kresic would be the IRS agent assigned to an audit, what documentation would be necessary for audit purposes, and whether plaintiff would be required to notify the IRS if it planned to provide products other than corn syrup.  Id.

Mr. Sanderson responded the next business day, January 24, 2011:

> There is no way for us to know who may be assigned to an IRS audit, so I would not assume it would be your current excise agent contact.  If you are audited, you will need to provide documentation of each step of the transaction as I outlined in the checklist previously sent.  This type of proof is no different from that normally requested in IRS audits.  . . .  As previously discussed, I think it presents a better case if you charge the user of the mixture for the fuel value, and they charge you a disposal fee. Two private letter rulings indicate that the IRS may consider the transfer as a "sale" even if you do not receive payment for the fuel. However, a private letter ruling is technically only binding to the taxpayer who received it.  While private letter rulings indicate the

> opinion of the [IRS] on a particular set of facts, they <u>may not be</u>
> <u>technically cited as precedent by other taxpayers</u>.
>
> As far as your AM registration, I think it should cover
> liquid biofuels in general, not just corn syrup. . . . <u>The fuel itself</u>
> <u>should be in a liquid state, not just solids suspended in water</u>. . . .
> Generally, the Btu value should be sufficient to create heat or
> energy when <u>combusted or oxidized</u> to be consider[ed] "fuel[.]"[11]
> There could be a concern, for example, if the moisture content is
> too high for the liquid to <u>produce heat or energy in excess of that</u>
> <u>required to evaporate the moisture</u>.
>
> Currently, <u>I do not have a full understanding of the</u>
> <u>economics</u>. How do you make money from this business if you
> pay the digester company to take the liquid? . . . Does this
> business [generate a positive] cash flow without the 50 cent per
> gallon credit?

<u>Id.</u> at 334 (emphases and footnote added). Mr. Sanderson later explained that the BTU value "relates to energy released when a particular substance goes through a chemical change," and that although the BTU value for a particular substance is "inherent in the fuel," the "[amount] recovered would be the issue" depending on the type of chemical reaction taking place. Pl.'s App. 279-80 (Sanderson Dep. 108:16-109:10). He acknowledged the distinctions between combustion, oxidation, and anaerobic digestion; mentioned that he was not sure what would happen if plaintiff's alternative fuel mixtures were combusted or oxidized; noted that plaintiff's alternative fuel mixtures possibly had too high of a moisture content "to produce heat or energy in excess of that which was required to evaporate the moisture" if it was placed in a boiler; and indicated that his January 24, 2011 comments concerning the BTU value were relevant because, at that point, he did not know whether the boiler was still a potential option for plaintiff's alternative fuel mixtures since he "didn't know who [plaintiff's] customers were." <u>Id.</u> at 311-13 (Sanderson Dep. 243:16-245:25); <u>see also id.</u> at 279-80 (Sanderson Dep. 108:23-109:6) (listing five types of chemical changes that release energy).

Later in the first quarter of 2011, after the IRS approved plaintiff's registration and plaintiff began operations, Mr. Kinley participated in a conference call with Mr. Sanderson. <u>Id.</u> at 257 (Kinley Dep. 78:13-25). He had reviewed the materials provided by Mr. Sanderson and wanted to speak with him "to make sure that [plaintiff] qualified" for the alternative fuel mixture credits as part of his "own due diligence [as a potential] investor." <u>Id.</u> at 258 (Kinley Dep. 79:1-10). After investing, Mr. Kinley was in charge of new business development for plaintiff. <u>Id.</u> at 247 (Kinley Dep. 17:12-20).

---

[11] "BTU" stands for "British [T]hermal Unit." Def.'s App. 220. It is "a traditional unit of heat . . . defined as the amount of heat required to raise the temperature of one pound of water by one degree Fahrenheit." <u>Id.</u>

On April 30, 2011, Mr. Carter contacted Mr. Sanderson with a list of questions focusing primarily on whether certain products would qualify as biomass and what testing needed to be performed.  Def.'s App. 339.  Mr. Carter also sought advice regarding BioBeast:

> [Plaintiff] is contemplating making an "engineered liquid fuel" from soybeans or wheat by-products.  Since this will be actually produced by [plaintiff] and not a liquid by-product from another plant[,] does it still qualify for the [alternative fuel mixture credit]?

Id.  On May 2, 2011, Mr. Sanderson advised:

> Alternative fuel is defined as:  liquid fuel derived from biomass defined under [I.R.C. § ]45K(c)(3), but excluding ethanol, methanol, or biodiesel.  The term "biomass" is defined broadly under [I.R.C. § ]45K(c)(3) to include any organic substance, other than oil, natural gas, coal (including lignite), or products thereof.  The biomass does not have to be a by-product, but it must be a liquid (not a solid).
>
> The Congressional Committee Reports cited fish oil mixed with diesel to fire a turbine and generate electricity as an example of an alternate fuel mixture that qualified for the mixture credit.
>
> Basically, the qualifying substance has to be (1) liquid, (2) biomass, and (3) sold or used as a fuel.  In addition, if you intend to claim the alternative fuel mixture credit, you must mix the qualifying substance with diesel (taxable fuel) before selling or using the fuel.  The producer/seller of the alternative fuel mixture gets the alternative fuel mixture credit.
>
> <u>I do not have enough facts or understand your operations well enough to give you any more specific advice</u>.

Id. at 338 (emphasis added).

On July 27, 2011, Mr. Huyser responded, on behalf of plaintiff, to an IRS request for information by providing answers to a questionnaire.  Pl.'s App. 488.  Mr. Sanderson had previously advised plaintiff that an IRS request for information was to be expected because "anyone processing excise tax credits . . . would have a review or audit by the IRS."  Id. at 256 (Kinley Dep. 77:13-20).  Before responding to the IRS, however, Mr. Huyser sought advice from Mr. Sanderson, forwarding a draft response to the questionnaire for his review.  Def.'s App. 401.  Mr. Sanderson made comments, asked questions, and suggested changes directly in the draft

response using a "track changes" feature.[12]  See generally id. at 402-12.  The following responses and comments are of particular note:

- Plaintiff reported that it had delivered approximately six million gallons of alternative fuel mixtures as of July 13, 2011, that resulted in the production of gas "with 70% methane content[,] a biogas that does not need further treatment to work well in standard co-gen engines and micro-turbines."  Id. at 404.  Plaintiff's statement regarding the production of methane biogas prompted Mr. Sanderson to ask:  "Which credit are you trying to claim:  the mixture credit for liquid biomass and diesel, or compressed liqu[e]fied biogas?  . . .  Does the digester company claim a credit?  If so there may be a problem of double-dipping."  Id.

- Plaintiff discussed the process of developing BioBeast, and Mr. Sanderson observed that certain terms within the discussion should be defined.  Id.

- Plaintiff stated that it was working with the WRA "to develop compressed natural gas."  Id.  Mr. Sanderson noted that more details were needed.  Id.

- Plaintiff reported that it still needed its registration because it was still "early in the development" of its business, and the alternative fuel mixture credit was "instrumental in [plaintiff's] effort to blend organic waste streams, create customized engineered anaerobic digester fuels[,] and create an infrastructure to provide [alternative fuel mixtures] broadly throughout the U.S."  Id. at 405.  Plaintiff then posited that "these new digester fuels will fundamentally change the way all U.S. municipal wastewater treatment plants will . . . increase their renewable energy production."  Id.

- Item four of the questionnaire sought information with respect to the type of alternative fuel being used for the alternative fuel mixture credit.  Id.  The available options were liquefied petroleum gas, "P" series fuels, liquefied hydrogen, liquefied fuel derived from coal, liquefied fuel derived from biomass, liquefied natural gas, liquefied gas derived from biomass, and compressed gas derived from biomass.  Id.  Plaintiff indicated

---

[12]  The final version of the questionnaire that plaintiff actually submitted to the IRS on July 27, 2011, is not included in the record before the court.

that it was seeking the credit for compressed gas derived from biomass, and Mr. Sanderson suggested that the correct response should be liquefied fuel derived from biomass.  Id.

- Plaintiff indicated that it purchased "liquid biomass waste streams"; sold "[b]lended, customized [alternative fuel mixtures]"; and produced "[b]lended, engineered [alternative fuel mixtures]."  Id.

- When plaintiff described its production process, Mr. Sanderson observed that the "approximate fuel content" and "BTU/gallon" was not included for each type of alternative fuel discussed—corn syrup/thin-stillage, food wastes, biodiesel wash water and soap stocks, and BioBeast.  Id. at 406-09.  Plaintiff declared that BioBeast was a "proprietary alternative fuel mixture that includes ground soy hulls . . . , various liquid biomass [feedstock,] and xantham gum [(]which hold[s] the solids in suspension[)]."  Id. at 407.  Mr. Sanderson commented that "this is a solid.  What happens to the ground soy hulls in the process[?]  For example, the IRS said generally that lignin from wood chips solubilizes in the liquid biomass to create a slurry for use as fuel."  Id.

- With respect to plaintiff's discussion of how its alternative fuel mixtures were used by its customers in the anaerobic digestion process, Mr. Sanderson asked, "how is the alternative fuel mixture used as a fuel[?]  Is it oxidized?  Does it creat[e] heat or thermal energy?"  Id. at 409.

- Plaintiff listed the names of its suppliers and customers, and provided the contact information for Mr. Huyser.  Id. at 411-12.  However, plaintiff failed to "[d]escribe the books and records maintained for each type of fuel," prompting a reminder from Mr. Sanderson that plaintiff "need[ed] to answer" the question.  Id. at 411.

After the IRS issued the August 19, 2011 CCA stating that alternative fuel mixtures used in an anaerobic digester were not "used as a fuel," see supra Section I.A, Mr. Sanderson contacted the IRS and spoke with an official in the excise tax division.  Pl.'s App. 288 (Sanderson Dep. 118:16-22).  He asserts that he was orally advised that, unless plaintiff's "AM" designation had been revoked, plaintiff "should continue to claim the credit[s]" because the IRS was going to be collecting questionnaires and conducting audits.  Id. at 288-89 (Sanderson Dep. 118:20-119:12); see also id. at 163-64.  Mr. Sanderson then advised plaintiff that it might "have a fight" regarding the propriety of the credits due to the August 19, 2011 CCA.  Id. at 288

(Sanderson Dep. 119:13-20).  Nevertheless, he continued to believe that plaintiff's "qualification for tax credits . . . was straightforward."  Id. at 287 (Sanderson Dep. 117:13-25).

Mr. Sanderson was the "primary expert [plaintiff] relied upon related to the qualification for the [alternative fuel mixture] credits and [plaintiff's] process . . . to make sure [plaintiff] followed the rules to be able to claim the credit."  Id. at 257 (Kinley Dep. 78:1-5).  However, although Mr. Sanderson provided "advice that [plaintiff's] process would qualify for tax credits," and offered to provide a "formal tax opinion," no formal tax opinion was ever requested.  Id. at 305-06 (Sanderson Dep. 225:16-226:11).

### G.  Plaintiff's Customers

The WRA was plaintiff's first customer when it began operations.  Id. at 214 (Carter Dep. 75:12-14).  The WRA was viewed as "one of the leaders in the anaerobic digestion industry in the country."  Id. at 204 (Huyser Dep. 168:14-18).  On January 21, 2011, the WRA executed an "Authorization to Discharge" that contained the following provisions:

> WASTEWATER SOURCE[:]  [Plaintiff]
>
> MATERIALS[:]  Alternative Fuel Mixture—[c]orn syrup[, c]heese whey[, a]nd wheat starch
>
> VOLUME[:]  Up to 50,000 gallons per day
>
> DATE(S) OF DISCHARGE[:]  January 15, 2011[,] through January 15, 2012
>
> DISCHARGE METHOD/LOCATION[:]
>
> Alternative fuel mixture[s] . . . to be delivered by tanker, sold/transferred to the [WRA] to be used as fuel in [the WRA's] anaerobic digesters.  [The WRA] will dispose of noncombustible material in the [alternative fuel mixtures].
>
> . . . .
>
> [Alternative fuel mixtures] contain[] bio-mass as defined in Internal Revenue Code §[ ]45K(c)(3).
>
> The [WRA] will charge [plaintiff] a disposal fee of $0.02634 per delivered gallon plus any sampling/analysis/sales tax.

Def.'s App. 46.

On January 31, 2011, Larry Hare of the WRA sent an electronic-mail message to another WRA official.  Id. at 113.  The subject line of the message was "Forms – Authorization to Discharge," and Mr. Hare attached documents that had been forwarded from Mr. Carter.  Id.  In the message, Mr. Hare discussed the pricing agreement between plaintiff and the WRA:

> This is for [plaintiff's] tax credit stuff.  A once a year charge of $950 for us to "buy" product ([alternative fuel mixtures]).  We turn around and charge them $950 for admin[istrative] fees, so it is a wash.  Any problem with me signing this?

Id.  On February 1, 2011, Mr. Hare and Mr. Huyser executed a document captioned "Attachment #1 to Authorization to Discharge" that provided:

> This Agreement is entered into this 1st day of February, 2011, by and between [the WRA] and [plaintiff].
>
> [The WRA] will pay $950 to [plaintiff] for the alternative fuel mixtures . . . delivered during the term of the Authorization to Discharge executed on January 21st, 2011 and during all subsequent terms.

Id. at 47.  The WRA subsequently billed plaintiff in the amount of $1,635.33 for "accepting the [alternative fuel mixtures] for the month of January 2011."  Id. at 170 (Hammitt Dep. 185:19-35).  Over the term of the agreement, plaintiff delivered an average of nine loads per day of various types of alternative fuel mixtures to the WRA at a cost to plaintiff of approximately $125 per load.  Id. at 154 (Hammitt Dep. 136:3-10).

On April 25, 2011, the WRA sent plaintiff an invoice in the amount of $11,673.24 for "Digester Foam Response Costs" incurred by WRA one month prior.  Id. at 323-24.  The corn oil-based mixture provided by plaintiff had been causing foam to spill out over the side of the digester tanks.  Id. at 141 (Hammitt Dep. 87:6-9).  In one instance, there was a "major upset" where "some of the foam got up into a part of the gas collection system."  Id. at 141 (Hammitt Dep. 87:12-16), 323 (invoice).  The incident forced the WRA to shut down one of its digesters while part of the collection system was taken apart, cleaned, and reassembled.  Id. at 141 (Hammitt Dep. 87:12-25); see also id. at 155-56 (Hammitt Dep. 137:2-138:24) (describing the scene).  Eventually, the WRA decided to stop accepting "corn oil-type loads."  Id. (Hammitt Dep. 87:3-7); accord id. at 145 (Hammitt Dep. 91:13-17).  The WRA experienced a certain degree of foaming from other alternative fuel mixtures, but the corn syrup-based mixture was the only one that the WRA refused to accept altogether.  Id. at 146 (Hammitt Dep. 92:4-13).

Plaintiff was one of "approximately [thirty] to [forty] different companies" delivering between fifty and seventy-five total loads per day to the WRA in 2011.  Id. at 143 (Hammitt Dep. 89:10-20), 148 (Hammitt Dep. 94:8-11).  The various feedstocks (including plaintiff's alternative fuel mixtures) that were delivered were mixed together, along with other types of

waste, and pumped into the WRA's digesters "almost continuously" as they arrived.  Id. at 131 (Hammitt Dep. 62:13-18), 133 (Hammitt Dep. 64:10-18), 135 (Hammitt Dep. 66:11-22), 147-48 (Hammitt Dep. 93:25-94:70), 50 (Hammitt Dep. 96:1-12); see also id. at 122 (Hammitt Dep. 26:14-21) (discussing the "three types of sludges that [go] into the anaerobic digesters," including the "hauled waste" that is delivered to the WRA).  The digesters were never filled or emptied completely, but operated within a range as material was both pumped in and pumped out.  Id. at 136-37 (Hammitt Dep. 67:12-68:13).

Feedstock could be tested prior to being added to the digesters for their potential to generate biogas, and the WRA would only accept materials that had a particular biomethane production potential.  Id. at 137-38 (Hammitt Dep. 68:25-69:23).  This pretesting, coupled with the number of loads received from particular suppliers on a given day, allowed the WRA to have a "general" understanding of the impact an individual supplier's feedstock had on methane production because "[d]ifferent wastes have different gas production rates."  Id. at 148-50 (Hammitt Dep. 94:17-96:25).  The WRA informed plaintiff that plaintiff's alternative fuel mixtures allowed the WRA to run three gas engines connected with electric generators twenty-four hours per day, seven days per week, whereas previously the WRA had only produced enough gas to run two of the engines.  Pl.'s App. 482 (Daniels Dep. 48:16-25).  However, the WRA was not "able to measure the amount of biogas production that came from one particular discharge company in 2011."  Def.'s App. 148 (Hammitt Dep. 94:12-16).  In other words, although the WRA had data available regarding the total amount of alternative fuel mixtures received from plaintiff in 2011, there were no figures for the "biogas production related solely to [alternative fuel mixtures] which [plaintiff] provided" because it "could not [be] specifically measure[d]."  Id. at 149 (Hammitt Dep. 95:10-25).  Similarly, the total electricity generated each day was tracked, but the electricity generated due to a specific feedstock or supplier could not be measured.  Id. at 151 (Hammitt Dep. 101:6-12).

In 2011, the WRA's total monthly production (i.e., from all of its suppliers) was as follows:

|  | Total Input (Gallons) | Total Gas Produced (ft$^3$) | Wasted Gas (ft$^3$) | Percent Wasted |
|---|---|---|---|---|
| Jan. | 11,679,078 | 31,889,594 | 194,673 | 0.6% |
| Feb. | 10,753,284 | 36,237,590 | 859,929 | 2.4% |
| Mar. | 12,617,317 | 42,639,829 | 2,352,960 | 5.5% |
| Apr. | 10,907,192 | 45,448,977 | 6,886,708 | 15.2% |
| May | 10,961,277 | 48,140,350 | 20,969,433 | 43.6% |
| June | 10,097,278 | 40,087,372 | 2,066,122 | 5.2% |
| July | 10,819,821 | 48,535,721 | 16,178,092 | 33.3% |
| Aug. | 9,419,452 | 44,040,050 | 17,385,822 | 39.5% |
| Sept. | 8,484,972 | 46,310,062 | 11,831,369 | 25.5% |
| Oct. | 9,324,849 | 50,427,568 | 18,841,051 | 37.4% |
| Nov. | 7,465,540 | 38,415,871 | 9,568,157 | 24.9% |
| Dec. | 9,897,975 | 45,722,214 | 14,018,696 | 30.8% |

| | Total Input (Gallons) | Total Gas Produced (ft$^3$) | Wasted Gas (ft$^3$) | Percent Wasted |
|---|---|---|---|---|
| Total | 122,428,035 | 517,895,198 | 121,216,012 | 23.4% |

Id. at 310-21.  The "wasted gas" column refers to the amount of gas that was flared each month. Id. at 158 (Hammitt Dep. 169:1-14).

One of plaintiff's other anaerobic digester customers was Amana Farms, Inc. ("Amana Farms").  See generally id. at 306-08 (customer agreement).  Plaintiff's agreement with Amana Farms contained the following recitations:

- [Plaintiff] is in the business of producing and mixing an alternative fuel mixture . . . which contains bio-mass by-product from corn ethanol production[,] and selling and delivering the [alternative fuel mixture] for use as fuel in anaerobic digesters;

- [Plaintiff] has an obligation to properly dispose of non-combustible waste components of the [alternative fuel mixture]; and

- Amana Farms owns and operates an anaerobic digester in Iowa County, Iowa which is capable of using the [alternative fuel mixture] as a fuel to produce energy and is in the business of properly disposing of waste products.

Id. at 306.  The agreement also contained the following terms:

- [Plaintiff] shall transfer, sell[,] and deliver [alternative fuel mixtures] to Amana Farms for use as fuel in its anaerobic digester and Amana Farms shall dispose of non-combustible components of the [alternative fuel mixtures].

- The term of this Agreement shall be for one (1) year commencing on January 31, 2011 to January 1, 2012.  . . .

- Amana Farms shall pay [plaintiff] the sum of one thousand dollars ($1,000.00) during the term of this Agreement and during each successive term.  [Plaintiff] shall pay Amana Farms a handling fee of twenty-five dollars ($25.00) per ton of [alternative fuel mixtures] delivered by [plaintiff] to Amana Farms pursuant to this Agreement.

- Amana Farms will accept four (4) loads or 24,000 gallons of [alternative fuel mixtures] a day, Monday through Friday of each week.

- Ownership of the [feedstock] will be transferred from [plaintiff] to Amana Farms upon acceptance of delivery.

Id. at 306-07.

Throughout 2011, plaintiff received $8,950.00 of income for the purchase of its alternative fuel mixtures and paid its customers a total of $1,678,029.07 in "disposal fees." Id. at 326. Plaintiff did not charge sales tax on any portion of the $8,950.00 received for the alternative fuel mixtures it delivered to its customers. Id. at 88-89 (Albers Dep. 76:23-77:2).

### H.  Plaintiff Claims Tax Credits

Plaintiff engaged Wendy Albers of Schuring and Uitermarkt to keep track of the feedstock that plaintiff received from its suppliers, receipts for taxable diesel fuel, and alternative fuel mixtures that plaintiff delivered to its customers; provide bookkeeping services; and submit the necessary forms to the IRS for plaintiff to receive the alternative fuel mixture credits.[13] Pl.'s App. 244-45 (Boyle Dep. 116:24-117:7), 400 (Albers Dep. 25:14-18). However, Ms. Albers was not asked to provide any advice to plaintiff.[14] Id. at 400 (Albers Dep. 25:14-23).

Ms. Albers reviewed a summary of the relevant regulations provided by Mr. Sanderson, personally reviewed the relevant I.R.C. provisions, and examined the documentation for each load of alternative fuel mixtures to ensure that the claims for tax credits could be substantiated. Id. at 401-02 (Albers Dep. 26:1-27:7); see also id. at 406-07 (Albers Dep. 34:15-35:9) (describing the workflow). Ms. Albers would then electronically submit Form 8849—utilizing Schedule 3 (Form 8849)—for the relevant time period and receive confirmation that it had been

---

[13]  Plaintiff retained a different firm to prepare its tax return based on accounting information supplied by Ms. Albers. Pl.'s App. 245 (Boyle Dep. 117:15-21).

[14]  Ms. Albers became a CPA after passing the licensing exam in February 2010, but did not have any specific training or experience with respect to renewable energy credits at the time of the events at issue. Def.'s App. 83-84 (Albers Dep. 7:6-23, 15:19-24). She did not have other clients claiming the alternative fuel mixture credits besides plaintiff. Pl.'s App. 405 (Albers Dep. 30:10-17).

accepted for processing.[15,16]  Def.'s App. 86 (Albers Dep. 46:6-18).  Plaintiff would later receive a payment from the IRS for the amount claimed.  Id. (Albers Dep. 46:19-21).  Plaintiff's first "credit request[]" was submitted in late January 2011.  Id. at 9.  Plaintiff received a total of $19,773,393.00 in alternative fuel mixture payments for 2011.  Id. at 326.

### I.  IRS Audit, Assessments, and Protests

On March 12, 2012, the IRS conducted an "initial audit" of plaintiff's claims for the alternative fuel mixture credit.  Id. at 341.  Ms. Albers used the information plaintiff had submitted to the IRS in July 2011 to answer the IRS's "technical questions" during the audit.  Id.

Following the initial audit, Mr. Huyser asked Mr. Sanderson to

> frame the question we would like to pose to a professor at Iowa
> State University . . . .  The question we would like the professor to
> answer would be how our biomass produces energy in the
> anaerobic digestion process.  We would like a clearly defined
> question that fits the legal definition of "producing energy" that
> you would feel comfortable defending, should the issue ever come
> up.

Id.

The IRS eventually determined that plaintiff was not entitled to the alternative fuel mixture payments that plaintiff had received.  On April 18, 2014, the IRS assessed the following amounts as tax to recoup the payments made for 2011:

- First quarter—$1,013,240.00, id. at 344;

- Second quarter—$2,354,501.50, id. at 348;

- Third quarter—$5,730,312.50, id. at 353;

- Fourth quarter—$10,675,339.00, id. at 358; and

---

[15]  Plaintiff's Form 8849 filings are not included in the record before the court.  However, it appears that plaintiff filed a Form 8849 approximately every ten days.  See Pl.'s App. 305-06 (Sanderson Dep. 225:21-226:1).

[16]  Ms. Albers never filed a Form 720 on behalf of plaintiff for plaintiff to obtain a credit against excise tax liability.  Def.'s App. 87 (Albers Dep. 70:19-23).

- Total—$19,773,393.00.[17]

See I.R.C. § 6206 (providing that excessive payments may be recouped via tax assessments).  At the same time, the IRS assessed a 75% fraud penalty plus statutory interest for each quarter. Def.'s App. 344, 348, 353, 358; Compl. Exs. B-1, B-3, B-5, B-7; see also I.R.C. § 6663 (providing a penalty of 75% for an underpayment of tax attributable to fraud).

Also on April 18, 2014, the IRS assessed, pursuant to I.R.C. § 6675, the following 200% excessive claim penalties for 2011:

- First quarter—$2,026,480.00, Def.'s App. 363;

- Second quarter—$4,709,003.00, id. at 367;

- Third quarter—$11,460,625.00, id. at 371;

- Fourth quarter—$21,350,678.00, id. at 375; and

- Total—$39,546,786.00.

See also Compl. Exs. B-2, B-4, B-6, B-8.

On April 29, 2014, plaintiff filed written protests of the tax and penalty assessments.  See generally Compl. Ex. A (protesting the tax and fraud penalty assessments); Compl. Ex. B (protesting the excessive claim penalty assessments).  On June 2, 2014, plaintiff sent directed payments for portions of the tax and fraud penalty assessments for each quarter, Compl. Exs. B-1, B-3, B-5, B-7, and for the excessive claim penalty assessments for each quarter, Compl. Exs. B-2, B-4, B-6, B-8.[18]  The IRS received the directed payments between June 5 and 13, 2014.  See Def.'s App. 344, 348, 353, 358 (tax and fraud penalty assessments); id. at 363, 367, 371, 375 (excessive claim penalty assessments).  On June 12, 2014, plaintiff filed eight Forms 843, Claim

---

[17]  The IRS treated plaintiff's Form 8849 filings as "substitutes" for Form 720 quarterly excise tax returns.  Def.'s App. 344 (first quarter 2011), 348 (second quarter 2011), 353 (third quarter 2011), 358 (fourth quarter 2011).  The statute of limitations on assessment had been extended to allow the audit and assessments to be completed.  Id.

[18]  When "additional taxes, penalty, and interest for one or more taxable periods have been assessed," and the taxpayer "voluntarily tenders a partial payment that is accepted by the [IRS] and . . . provides specific written directions as to the application of the payment, the [IRS] will apply the payment in accordance with those directions."  IRS Rev. Proc. 2002-26, § 3.01, 2002-1 C.B. 746; see also Larson v. United States, 89 Fed. Cl. 363, 410-12 (2009) (discussing the ability of taxpayers to make voluntary directed payments to satisfy specific outstanding tax, penalty, and interest liabilities).  Such directed payments allow a taxpayer to pursue refund claims and, if necessary, subsequent litigation.  See infra note 21.

for Refund and Request for Abatement, seeking a refund of its directed payments and abatement of the remaining assessments for each quarter with respect to the tax, fraud penalty, and excessive claim penalty assessments.  Compl. Exs. C-1, C-3, C-5, C-7 (tax and fraud penalty for each quarter); Compl. Exs. C-2, C-4, C-6, C-8A (excessive claim penalty for each quarter).

On July 14, 2014, the IRS assessed additional penalties against plaintiff for plaintiff's failure to file returns and failure to pay tax (i.e., failure to repay the alternative fuel mixture payments it received) for the second, third, and fourth quarters of 2011.  Def.'s App. 344, 348, 353, 358; Compl. Exs. D-1, D-2, D-3 (IRS Notice CP220 for each quarter notifying plaintiff of the failure-to-file and failure-to-pay penalties[19]); see also I.R.C. §§ 6651(a)(1) (providing a penalty of up to 25% of the tax due for failure to file a return by the due date), 6651(a)(3) (providing a penalty of up to 25% for failure to pay tax within twenty-one days of notice and demand).  Plaintiff sent directed payments for the failure-to-file and failure-to-pay penalties on July 23, 2014.  Compl. Exs. D-1, D-2, D-3.  The IRS received the directed payments between July 28 and 30, 2014.  Def.'s App. 344, 353, 358.  On August 8, 2014, plaintiff filed three Forms 843, seeking a refund of its directed payments and abatement of the remaining assessments for each quarter with respect to the failure-to-file and failure-to-pay penalties.  Compl. Exs. E-1, E-2, E-3.

## J.  Procedural History

After receiving no response from the IRS, plaintiff filed suit in this court on February 18, 2015.  In its complaint, plaintiff alleges that it was entitled to the alternative fuel mixture credits and, therefore, it is not liable for the excessive claim penalties under I.R.C. § 6675, the civil fraud penalty under I.R.C. § 6663, or the failure-to-file and failure-to-pay penalties under I.R.C. § 6651.  Compl. ¶ 42.  Plaintiff also alleges, in the alternative, that even if it were not entitled to the credits, it reasonably relied on the advice of various attorneys, accountants, and IRS personnel, and thus is not liable for the excessive claim, failure-to-file, and civil fraud penalties.  Id. ¶¶ 43-45, 49, 53.  Plaintiff seeks a refund of its directed payments and interest thereon, abatement of the remaining tax and penalty assessments, abatement of the interest assessed, and attorney fees and costs pursuant to I.R.C. § 7430.[20]  Id. ¶ 61.

Defendant answered on June 26, 2015, and asserted counterclaims for the tax assessed and the excessive claims penalties, less prior payments.  The parties then engaged in discovery, which included the exchange of expert reports, before filing cross-motions for summary judgment.  The motions are now fully briefed, and the court deems oral argument unnecessary.

---

[19]  The "[a]mount due on account before adjustment" shown on each IRS Notice CP220 reflects the 75% fraud penalty minus the directed payments for each quarter that were received on June 5, 2014.  Compare Compl. Exs. D-1, D-2, D-3, with Def.'s App. 348, 353, 358.

[20]  The parties do not dispute the accuracy of the interest assessments.  Since the interest assessments are merely derivative of the tax and penalty assessments, they are not (in and of themselves) a substantive issue in this case.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial.  Id. at 324.  Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the court must not weigh the evidence or make findings of fact.  See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter.  Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").  Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

In ruling on cross-motions for summary judgment, the court "must evaluate each motion on its own merits."  First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir. 2003).  If neither party meets its burden, then the court must deny both motions.  Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998).

## III.  ALTERNATIVE FUEL MIXTURE CREDIT

As described above, a taxpayer could qualify for the alternative fuel mixture credit in 2011 by blending liquid fuel derived from biomass and at least 0.1% diesel fuel into a mixture that was used or sold for use as a fuel, provided that the taxpayer was properly registered. Although not all of these requirements are material, the court will, for the sake of completeness, address each one.[21]  The parties do not dispute the accuracy of the Forms 8849 filed by plaintiff. In other words, the parties implicitly agree that, if these requirements were met, plaintiff was entitled to the credits as claimed.

### A.  Plaintiff Was Properly Registered

The parties do not dispute that plaintiff was properly registered as required by I.R.C. § 6426(a) and IRS Notice 2006-92, § 4(b).  Plaintiff's registration letter contained the appropriate designations—i.e., those necessary for a blender, producer, and seller of an alternative fuel mixture.  Further, plaintiff's registration letter was dated January 14, 2011—prior to the beginning of the term of plaintiff's agreement with the WRA, plaintiff's first customer. Finally, the parties do not dispute that plaintiff's registration was not revoked during 2011. Therefore, the court concludes that plaintiff met the registration requirement for the alternative fuel mixture credit.

### B.  Plaintiff's Alternative Fuel Mixtures Contained 0.1% Diesel Fuel

The parties do not dispute that plaintiff's alternative fuel mixtures contained 0.1% diesel fuel as required by I.R.C. § 6426(e)(2) and IRS Notice 2006-92, § 2(b).  The record before the court details how plaintiff contracted with a local trucking company to pick up feedstock from plaintiff's suppliers and add the appropriate amount of diesel fuel prior to delivery to plaintiff's customers, and how the truck drivers would obtain various receipts and weight tickets to track

---

[21]  As an initial matter, the court finds that it has jurisdiction over the instant tax refund suit.  See United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 4 (2008) (observing that tax refund suits may be brought in federal district court or the Court of Federal Claims).  To bring a tax refund suit, a plaintiff must (1) make full payment of its tax liabilities, Flora v. United States, 357 U.S. 63, 75 (1958); (2) file a timely claim for refund with the IRS, I.R.C. § 7422(a); and (3) file a timely complaint after the refund claim is denied or deemed denied, id. § 6532(a). In the instant case, the disputed tax is a divisible tax because it is assessed on a per-transaction basis, and therefore plaintiff's directed payments are sufficient to satisfy the Flora full payment rule.  See Cencast Servs., L.P. v. United States, 729 F.3d 1352, 1366 (Fed. Cir. 2013) ("[W]here a tax is divisible, the taxpayer may pay the full amount on one transaction, sue for a refund for that transaction, and have the outcome of this suit determine his liability for all the other, similar transactions." (internal quotation marks and emphases omitted)).  Second, plaintiff filed its refund claims with the IRS on Form 843 less than sixty days after each assessment, well within the two-year period permitted by I.R.C. § 6511(a), rendering its refund claims timely.  Finally, plaintiff waited the required six months under I.R.C. § 6532(a)(1) after filing its refund claims with the IRS, and not receiving a response, before filing suit in this court.

the amount of feedstock and fuel.  These records were then delivered to an outside accounting firm that prepared the Forms 8849 on plaintiff's behalf to claim the alternative fuel mixture credits.  Further, experts for both parties discussed the impact of diesel fuel on plaintiff's feedstock in their reports.  Therefore, the court concludes that plaintiff included the minimum amount of diesel fuel in its mixtures that was necessary to qualify for the alternative fuel mixture credit.

## C.  The Alternative Fuel Component of Plaintiff's Mixtures Was Derived From Biomass

Similarly, there is no dispute that the alternative fuel component of plaintiff's mixtures was derived from biomass.  As noted above, biomass is "any organic material" that is not oil, natural gas, coal (including lignite), or any product thereof.  I.R.C. § 45K(c)(3).  Plaintiff's primary feedstock was derived from corn syrup.  Plaintiff also utilized wheat starch, cheese whey, organic substances contained within biodiesel wash water and soap stocks, soy hulls, and crop oil as major ingredients in its feedstock.  All of these substances are organic, and none of them are oil, natural gas, coal, lignite, or any product thereof.  Indeed, defendant's expert, Dr. Michael J. Cooney, averred that plaintiff's feedstocks "are clearly derived from biomass."  Def.'s App. 186; accord id. at 208 ("[O]rganic feedstocks used by [plaintiff] satisfy the biomass requirement.").  Plaintiff's expert, Dr. Zitomer, similarly stated that plaintiff's feedstocks "were derived from biomass," and emphasized that he "agree[d] with Dr. Cooney in this regard."  Pl.'s App. 107.  Therefore, the court concludes that the alternative fuel component of plaintiff's mixtures was derived from biomass.

## D.  The Alternative Fuel Component of Plaintiff's Mixtures Was a Liquid Fuel

Unlike the registration, diesel fuel, and biomass requirements, the parties dispute whether the alternative fuel component of plaintiff's mixture was a liquid; however, they do not dispute the underlying facts.  Dr. Cooney describes plaintiff's feedstocks as "collection[s] of solid fuels dissolved or suspended in water."  Def.'s App. 208.  Dr. Cooney explains that, although plaintiff's feedstocks were derived from biomass, their water content must be removed before those feedstocks can be used as fuel—leaving solids as "all that remains.  Id.  Dr. Zitomer similarly observes that the water portion of plaintiff's feedstocks was not a fuel, but specifies that the "organic suspended solids and the organic dissolved solids" in water constitute a "liquid fuel together" because "the material itself is a liquid[ and w]ater is a component."  Pl.'s App. 339 (Zitomer Dep. 63:2-24).  In other words, the parties agree that plaintiff's feedstocks can be described as solids suspended or dissolved in water, and that those solids can be used as fuel, but disagree as to whether such feedstocks are actually liquids based on their interpretation of the phrase "liquid fuel."

In declaring that the fuel in plaintiff's feedstocks is the solid portion, see Def.'s App. 208, Dr. Cooney distinguishes between the terms "solids suspended or dissolved in water" and "liquid," Pl.'s App. 132-33 (Cooney Dep. 50:22-51:3).  He contends that "it would be inappropriate to describe any substance that has materials in it that do not meet the five defining

properties of a liquid to be a liquid,"[22] and observes that "water that contains dissolved or suspended solids" cannot be accurately described using one of the five states of matter because "[i]t is a hybrid."[23] Id. at 133-34 (Cooney Dep. 51:13-52:24).

Dr. Zitomer, meanwhile, posits that feedstocks "are liquids if they meet the five defining properties" of liquids, explains how plaintiff's feedstocks met those requirements, and remarks that plaintiff's feedstocks could be accurately described as "liquid suspensions"—i.e., "another unique type of liquid that contains more than one phase"—because they contained both water and suspended solids. Id. at 104. He also stresses that "[s]ome other materials, such as orange juice and tap water[,] are mixtures [containing] solids dissolved or suspended in water, and are reasonably considered liquids." Id. He highlights "orange juice with pulp" as an example of a mixture that "contains suspended solids in water and is a liquid." Id. at 105.

Dr. Cooney recognizes that "[i]n normal everyday language, the word 'liquid' would be used to refer to solids suspended or dissolved in water" even though, "from a scientific standpoint," the appropriate description would be "[s]olids dissolved or suspended in water." Id. at 133 (Cooney Dep. 51:4-12); accord id. at 135 (Cooney Dep. 53:17-22). He also acknowledges that, in addition to the "everyday language of a layperson," the term "liquid" is used "to describe substances or water that would contain suspended or dissolved solids" even in the "everyday language of scientists" despite what he described as the inaccuracy of such usage. Id. at 135 (Cooney Dep. 53:17-24).

The court agrees with plaintiff that plaintiff's feedstocks constitute liquids for purposes of I.R.C. § 6426. "It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Sandifer v. U.S. Steel Corp., 134 S. Ct. 870, 876 (2014) (internal quotation marks omitted). When Congress implemented the alternative fuel mixture credit in 2005, the phrase "liquid fuel" was not specifically defined. Nor was the phrase "liquid fuel" specifically defined in the I.R.C. when the I.R.C. § 6426 was amended in 2008, 2010, 2013, 2014, 2015, or 2018. Therefore, Congress must have intended the word "liquid" to have its "ordinary, common" meaning. As the experts for both parties observed, a mixture comprised of water and dissolved or suspended solids is clearly a "liquid" in layman's terms, and even scientists refer to such mixtures as liquids.

Plaintiff's primary feedstock, corn syrup thin stillage, is similar to black liquor. As described above, black liquor undergoes a treatment and dewatering process before becoming heavy black liquor, which is comprised of both dissolved solids and water. Also as described

---

[22] The five defining properties of a liquid are "(1) liquids are practically incompressible, (2) liquids maintain their volume no matter what the shape or size of the container, (3) liquids have no characteristic shape, (4) liquids diffuse, but slowly, and (5) liquids evaporate from open containers." Pl.'s App. 104.

[23] The five states of matter are solid, liquid, gas, plasma, and Bose-Einstein condensates. Pl.'s App. 133-34 (Cooney Dep. 51:25-52:5).

above, corn syrup thin stillage (like black liquor) undergoes a treatment and dewatering process to produce thickened syrup, which (like black liquor) is comprised of both dissolved solids and water.  The IRS paid billions of dollars in alternative fuel mixture credits for black liquor before it was specifically excluded from the definition of an alternative fuel by the Act of 2010's amendment to I.R.C. § 6426.  However, the exclusion was implemented to eliminate a windfall to paper manufacturers, not because black liquor is a mixture of water and dissolved solids.

In short, the common usage of the term "liquid"—by both the layman and the scientist— encompasses a mixture of water and dissolved or suspended solids.  Congress has had ample opportunity to exclude such a mixture from the definition of a liquid, and has not done so.  Therefore, the court concludes that, as a matter of law, a "liquid" encompasses a mixture comprised of water and dissolved or suspended solids for purposes of I.R.C. § 6426.

Whether such a mixture constitutes a liquid fuel, then, depends on whether the solid components are capable of being used as a fuel.  (Both experts agreed, and the court concludes, that water is not capable of being used as a fuel.)  As noted above, the experts for both parties agree that the organic dissolved or suspended solids in plaintiff's feedstocks were capable of being used as fuel.  Accordingly, plaintiff's feedstocks were capable of being used as fuel.  Therefore, since plaintiff's feedstocks were both a liquid and capable of being used as fuel, the court concludes that plaintiff's feedstocks constituted "liquid fuel" for purposes of I.R.C. § 6426.

### E.  Plaintiff Cannot Prove That Its Alternative Fuel Mixtures Were Used as a Fuel

By combining a liquid fuel derived from biomass with the requisite amount of diesel fuel, plaintiff produced an alternative fuel mixture as defined by I.R.C. § 6426(d)-(e).  However, plaintiff is still required to prove that it either used the mixtures as a fuel or that it sold its mixtures for use as a fuel.  I.R.C. § 6426(e)(2).  The parties vigorously disagree on whether use of plaintiff's mixtures in the anaerobic digestion process constitutes "use as a fuel."

Similar to the term "liquid fuel," the phrase "use as a fuel" is not defined in the I.R.C.  While the alternative fuel credit was limited to alternative fuels that were used or sold for use as a fuel in motor vehicles, motorboats, or aviation, there was no such limitation with respect to the alternative fuel mixture credit.

In his expert report, Dr. Cooney avers that whether an alternative fuel mixture "is used as a fuel in anaerobic digesters depends on which of the many technical definitions of the word fuel is used."  Def.'s App. 209.  He then provides five definitions of "fuel" and analyzes whether the use of plaintiff's mixtures in the anaerobic digestion process constituted use as a fuel under each definition.  He observes that if a fuel is defined as "a substance that is consumed in the production of energy, there is some traction to the claim that [plaintiff's mixtures were] used as a fuel."  Id. at 211.  However, Dr. Cooney posits that the anaerobic digester merely converts one form of chemical potential energy (i.e., the mixture) into another form of chemical potential energy (i.e., the biogas and digestate end products), and thus does not actually produce work or energy.  Id.  He notes that plaintiff's mixtures were "not directly combustible and [are] therefore

not consumed in the anaerobic digester in any manner similar to how a fuel is consumed in a motor vehicle or motorboat." Id. (emphasis omitted).

Instead of taking the approach advanced by Dr. Cooney and focusing on the anaerobic digester, Dr. Zitomer emphasizes that "[t]he anaerobic digester itself is only one component of an overall anaerobic digester system." Pl.'s App. 105. He examined the "process composed of an anaerobic digester, the associated engine generator set[,] and appurtenances that comprise the anaerobic digester system." Id. at 101. He likens an anaerobic digester system to a "power plant, which takes in coal as fuel and delivers heat and electricity." Id.

The court observes that Dr. Cooney's comparison of the anaerobic digestion process to motor vehicles, motorboats, and furnaces is unavailing because, unlike the alternative fuel credit, the alternative fuel mixture credit was not limited to those types of uses. To that end, the court agrees with plaintiff's expert that the proper lens with which to examine whether plaintiff's alternative fuel mixtures were used as a fuel is the entire system, not just the digester itself. The court applies the definition promulgated in IRS Notice 2006-92—i.e., an alternative fuel mixture is "used as a fuel" when it is "consumed in the production of energy."

IRS Notice 2006-92 contains two examples of a substance being used as a fuel: in an internal combustion engine to power a vehicle and in a furnace to produce heat. However, there is no indication that "use as a fuel" was limited to these (or similar) situations, particularly in light of the limitation placed by Congress on the alternative fuel credit (to vehicles, boats, and airplanes) but not on the alternative fuel mixture credit. In other words, there is no reason that "use as a fuel" cannot extend to anaerobic digester systems. After all, plaintiff's alternative fuel mixtures were input into an anaerobic digester system, and the system produced electricity. There is no question that a substance used to produce electricity is used as a fuel. Cf. supra note 3 and accompanying text (discussing the definition of "liquid fuel"). That the production of methane gas was an intermediate step in the process is of no moment. The use of plaintiff's mixtures to produce methane gas and then electricity is similar to the use of heavy black liquor to produce steam and then electricity.[24]

However, the court's determination that an alternative fuel mixture can be "used as a fuel" in an anaerobic digester system is not the end of the inquiry. The "production of energy" requirement in the definition of "used as a fuel" must necessarily refer a net production of energy. Otherwise, the requirement would be entirely superfluous. It would make no sense for a fuel to use, for example, five units of energy to produce only three; in that instance, the fuel would be antithetical with respect to the production of energy. Taken further, if "production of energy" simply meant that some energy was produced, then a process that consumed 1,000 units of energy would still qualify if it produced only one. Since Congress provided the alternative fuel mixture credit to encourage the development of new energy sources, allowing credits to be claimed for fuels that ultimately consume energy, rather than produce it, would defeat the purpose for which the credit was enacted. On the other hand, construing the "production of

---

[24] Thus, the court is not persuaded by the reasoning in the August 19, 2011 CCA with respect to anaerobic digesters because the CCA focuses on only one step of the process.

energy" requirement to mean a net production of energy is consistent with the purpose of the alternative fuel mixture credit. See Haggar Co. v. Helvering, 308 U.S. 389, 394 (1940) ("All statutes must be construed in the light of their purpose. A literal reading of them which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and legislative purpose. Here the purpose is unmistakable." (citations omitted)), quoted in Pitsker v. OPM, 234 F.3d 1378, 1383 (Fed. Cir. 2000).

In other words, an alternative fuel mixture that is used in a manner that does not result in a net production of energy cannot reasonably be said to have been used as a fuel. Thus, if a mixture is used to produce methane that is simply flared, that mixture is not used as a fuel because there is no energy produced once the process is complete. The IRS guidance that "[a] mixture that is destroyed in a fire or other casualty loss is not used as a fuel," IRS Notice 2006-92, § 2(f)(2), underscores this point. Further, Dr. Zitomer noted that if "biogas was flared and heat or power was not recovered at any time," then there was no use of the mixture "as a fuel." Pl.'s App. 340 (Zitomer Dep. 80:21-24). Dr. Cooney similarly agreed that "[f]uel that is destroyed in a fire" or simply "dumped . . . in a river" is not "used as a fuel." Id. at 128 (Cooney Dep. 43:13-21).

In using heavy black liquor to produce steam and then electricity, the chemical transformation of the inorganic solids in heavy black liquor into the smelt byproduct consumes energy, but there is nevertheless a net production of energy once the entire process is complete. In using feedstock to produce methane gas and then electricity, the chemical transformation of the inorganic solids contained in the feedstock into the biosolid byproduct consumes energy, and energy is also consumed when the methane gas is flared.

However, unlike with heavy black liquor, it is impossible to definitively ascertain whether the energy consumption when using a particular feedstock in an anaerobic digester is more than the energy that is produced once the methane gas that is not flared is converted into electricity. Problematically for plaintiffs, its alternative fuel mixtures were combined with other feedstock before being placed in the anaerobic digesters, at least at the WRA. As such, with respect to the WRA (and perhaps plaintiff's other customers), the biogas production—and hence, the resulting electricity production—related solely to plaintiff's mixtures simply cannot be measured.

In short, plaintiff cannot prove that its specific alternative fuel mixtures were responsible for the WRA's increased biogas (and resulting energy) production or whether the biogas produced as a result of its specific mixtures was even used at all to produce energy (since a portion of the biogas produced was flared). Plaintiff's inability to do so is fatal to its claim. See, e.g., Wash. Mutual, Inc. v. United States, 130 Fed. Cl. 653, 686-87 (2017) (explaining that a tax assessment is presumptively correct and that "plaintiffs bear the burden to prove, by a preponderance of the evidence, that they are entitled to the tax [credits] at issue").

Therefore, the court concludes that plaintiff cannot prove that its alternative fuel mixtures were used as a fuel—an element essential to plaintiff's claim and an issue on which plaintiff bears the burden of proof. Accordingly, the court must grant summary judgment in favor of defendant with respect to plaintiff's entitlement to the alternative fuel mixture credits for 2011.

## F. Plaintiff Did Not Sell Its Alternative Fuel Mixtures

Because plaintiff cannot prove that its alternative fuel mixtures were used as a fuel, whether plaintiff sold its alternative fuel mixtures is immaterial. However, even if plaintiff's alternative fuel mixtures were used as a fuel, plaintiff would still not be entitled to the alternative fuel mixture credits that it claimed for 2011 because plaintiff did not sell its alternative fuel mixtures. Plaintiff contends that "[t]he amount of consideration is irrelevant and whether [plaintiff] made a profit on the transaction is irrelevant." Pl.'s Mot. Summ. J. ("Pl.'s Mot.") 19, ECF No. 39. Plaintiff is correct on the law, but misses the mark in its application. Despite the "small sales price" paid by most of plaintiff's customers, id., the economic reality of the exchanges was that plaintiff paid its customers to take its alternative fuel mixtures. Further, plaintiff cannot rely on being "relieved of its obligation to dispose of the by-products," id., as consideration to support its alleged sales.

### 1. The "Small Sales Price" Lacked Substance

As explained above, consideration "may consist of money, services, or other things." Treas. Reg. § 48.0-2(a)(5). Plaintiff argues that the act of transferring title in its alternative fuel mixtures to its customers in exchange for a small amount of money constituted a sale because "[s]ales occurred when title was transferred for consideration." Pl.'s Resistance to Def.'s Opp'n ("Pl.'s Resp.") 10, ECF No. 41. Defendant avers that plaintiff did not transfer title in its mixtures for a price, but instead "paid wastewater treatment plants and farms to dispose of its mixtures." Mem. Supp. Def.'s Cross-Mot. Summ. J. & Opp'n to Pl.'s Mot. Summ. J. ("Def.'s Opp'n") 24, ECF No. 40. Defendant also observes that "some wastewater treatment plants did not pay anything for [plaintiff's] mixtures." Id. (relying on Pl.'s Mot. 19).

The court is required to examine the actual substance of the transactions consummated by plaintiff. Under the substance-over-form doctrine, courts must "look[] to the objective economic realities of a transaction rather than to the particular form the parties employed." Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). In other words, the form of a transaction will not be "controlling for tax purposes when the objective economic realities are to the contrary." Id.; accord Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1355 (Fed. Cir. 2006) ("[A]lthough the taxpayer has an unquestioned right to decrease or avoid his taxes by means which the law permits, the law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality." (citation omitted)). Further, under the economic substance doctrine, "tax benefits . . . with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose." I.R.C. § 7701(o)(5)(A). The economic substance doctrine is to be applied as follows:

> In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if—
>
> > (A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and
> >
> > (B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction.

Id. § 7701(o)(1).  Both the substance-over-form and economic substance doctrines are "judicial tool[s] for effectuating the underlying Congressional purpose that, despite literal compliance with the statute, tax benefits not be afforded based on transactions lacking substance."  Consol. Edison Co. of N.Y., Inc. v. United States, 703 F.3d 1367, 1375 (Fed. Cir. 2013).

Plaintiff relies on Sacks v. Commissioner to support its averment that the economic substance doctrine is inapplicable to the alternative fuel mixture credit and therefore its transactions are not to be disregarded simply because they "have no pre-tax profitability where tax incentives create the after-tax profit."  Pl.'s Resp. 11.  In Sacks, the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") explained that the investment at issue "did not become a sham just because its profitability was based on after-tax instead of pre-tax projections" and that "[a]bsence of pre-tax profitability does not show whether the transaction had economic substance beyond the creation of tax benefits."  69 F.3d 982, 991 (9th Cir. 1995). The Ninth Circuit emphasized that Congress provided tax incentives "for alternative energy investments . . . to induce investments which otherwise would not have been made," and that if the IRS could "deny tax benefits when the investments would not have been made but for the tax advantages, then only those investments would be made which would have been made without the Congressional decision to favor them."  Id. at 992.  Therefore, according to the Ninth Circuit, allowing the IRS to "use the reason Congress created the tax benefits as a ground for denying them . . . violates the principle that statutes ought to be construed in light of their purpose."  Id. Plaintiff also relies on a July 15, 2011 IRS Guidance for Managers document ("IRS Guidance") to support its position that "the [economic substance] doctrine is likely not appropriate with regards to transactions that generate targeted tax incentives consistent with Congressional intent."  Pl.'s Resp. 11 (citing Pl.'s App. 496).

Plaintiff's characterization of Sacks and the IRS Guidance ignores an inconvenient qualifier.  In Sacks, the Ninth Circuit specified that "[w]here a transaction has economic substance, it does not become a sham merely because it is likely to be unprofitable on a pre-tax basis."  69 F.3d at 991 (emphasis added).  Similarly, the IRS Guidance contained a list of "facts and circumstances [that] tend to show that application of the economic substance doctrine to a transaction is likely not appropriate," including, as relied on by plaintiff, a "[t]ransaction that generates targeted tax incentives, in form and substance, consistent with Congressional intent in providing the incentives."  Pl.'s App. 496 (emphasis added).  Thus, while plaintiff is correct that it need not show that its business model was profitable absent the alternative fuel mixture

payments, see Salem Fin., Inc. v. United States, 786 F.3d 932, 950 (Fed. Cir. 2015), plaintiff cannot escape the requirement that its business model must substantively align with Congressional intent.  Because Congress unequivocally intended that an alternative fuel mixture be "sold . . . for use as a fuel" for a taxpayer to qualify for the alternative fuel mixture credit, I.R.C. § 6426(e)(2)(A), any sales on which the credit is based must be genuine sales in both form and substance for a taxpayer to be undertaking the type of activity that Congress intended to encourage.

In the instant case, the "small sales price" that plaintiff collected from its customers lacked economic substance because those nominal amounts were collected solely for the purpose of receiving tax credits.  Plaintiff's agreement with the WRA contains a classic example of a sale price that is devoid of substance.  Plaintiff's sale price of $950 for all of its alternative fuel mixtures was intentionally offset by a $950 administrative fee that the WRA charged so that the sale price and fee would be "a wash."  Def.'s App. 46.  In other words, the parties intended for there to be no substantive sale price—they simply engaged in "a contrived transaction performing no economic or business function other than to generate tax benefits."  Salem Fin., 786 F.3d at 951.  Even disregarding the administrative fee, a one-time $950 sale price for "up to 50,000 gallons per day" of alternative fuel mixtures over the course of an entire year, id., lacks substance because the amount "sold" was to be determined by the seller rather than the buyer.  Similarly, plaintiff's agreement to "sell" up to 120,000 gallons per week of alternative fuel mixtures over the course of eleven months to Amana Farms for a one-time fee of $1,000 lacks substance because plaintiff determined the quantity it would "sell"—Amana Farms did not determine the quantity it would "purchase."  In both instances, the "sales" price did not have an independent business purpose and only served to qualify the transactions as sales for purposes of the alternative fuel mixture credit.

Altogether, plaintiff "sold" nearly 40 million gallons of alternative fuel mixtures for $8,950 in 2011.  Plaintiff did not charge on a per-gallon, per-ton, or per-load basis, but collected flat fees from its customers for undefined quantities (not to exceed certain limits) that were determined by plaintiff, the purported seller, rather than its customers, the purported buyers.  That plaintiff never collected sales tax on any of its transactions (whether with the WRA, Amana Farms, or other customers) further belies the argument that any of the transactions were legitimate "sales."  The only substantive exchanges that occurred were plaintiff paying its customers to take its alternative fuel mixtures—on a per-gallon basis to the WRA and a per-ton basis to Amana Farms.

Accordingly, the court concludes that it was permissible for the alternative fuel mixture credit to supply the profit motive for plaintiff's business model, but that plaintiff's transactions were not bona fide sales supported by consideration.

**2.  Plaintiff's Relief From Its Purported Disposal Obligation Was Not Consideration**

In addition to relying on the nominal amounts received from customers in exchange for its alternative fuel mixtures, plaintiff asserts that being "relieved of its obligation to dispose of the by-products" remaining at the conclusion of the anaerobic digestion process constituted consideration for the sale.  Pl.'s Mot. 19.  Plaintiff relies on IRS Private Letter Rulings 9229038 and 9631012 in support of its position.  Defendant indicates that plaintiff's position is untenable because the private letter rulings may not be relied upon, concern a different statute than the one at issue here, and involve factual scenarios that are distinguishable from those in the case at bar.  The court is compelled to agree with defendant that plaintiff impermissibly attempts to rely on the specified private letter rulings and that, in any event, those rulings do not support plaintiff's position.

**a.  Plaintiff May Not Rely on Private Letter Rulings**

Courts generally do not find private letter rulings to be of precedential value in tax cases, although some courts consider private letter rulings to be persuasive authority.[25]  <u>Amergen Energy Co. v. United States</u>, 94 Fed. Cl. 413, 418 (2010) (collecting cases).  The majority view is that private letter rulings may not be "used or cited as precedent," "to advance a particular interpretation of the Internal Revenue Code," or to otherwise be "used for their substance," but may be used "as evidence of the administrative practice of the IRS" and "may, in certain circumstances, be used in abuse of discretion cases."  <u>Id.</u> at 419 (internal quotation marks omitted).  In an abuse of discretion case, private letter rulings can be used to demonstrate that the IRS issued "different rulings to two directly competing taxpayers."  <u>Id.</u>

In the instant case, plaintiff attempts to use the IRS private letter rulings for a prohibited purpose.  First, plaintiff does not allege that the IRS abused its discretion by issuing different rulings to one of its competitors.  Although plaintiff proclaims that the IRS's reasoning in its August 19, 2011 CCA was flawed, any flaws contained therein, if any, are irrelevant because the CCA did not address whether certain transactions qualified as sales.  Second, the administrative practice of the IRS is not relevant to whether plaintiff was entitled to claim alternative fuel mixture credits for 2011.  Rather, the only purpose for which plaintiff references IRS Private Letter Rulings 9229038 and 9631012 is their substantive value in establishing its entitlement to

---

[25]  Per I.R.C. § 6110(k)(3), private letter rulings "may not be used or cited as precedent." However, the prohibition on using private letter rulings as precedent does not operate to "change the precedential status (if any) of written determinations with regard to taxes imposed by subtitle D of [the Internal Revenue Code]."  I.R.C. § 6110(k)(3).  Subtitle D imposes various miscellaneous excise taxes, including those described in I.R.C. § 4081.  Therefore, I.R.C. § 6110(k)(3) does not, by itself, prevent any relevant private letter ruling from being cited as precedent in the instant case.  However, IRS Private Letter Rulings 9229038 and 9631012 each specifically provide that it "is directed only to the taxpayer who requested it" and that it "may not be used or cited as precedent."  Therefore, by their own terms, the private letter rulings relied on by plaintiff have no "precedential status" to begin with.

the credits.  Therefore, plaintiff's proposed use of private letter rulings is impermissible under Amergen.  But see infra Section IV.A.3 (discussing plaintiff's reasonable cause defense).

**b.  The Private Letter Rulings Cited by Plaintiff Do Not Support Its Position**

To the extent that the private letter rulings relied upon by plaintiff constitute persuasive authority, they do not support plaintiff's position.

In IRS Private Letter Ruling 9229038, the IRS considered a request for a ruling from X, who was "engaged in the business of managing wastes."  IRS Priv. Ltr. Rul. 9229038 (July 17, 1992).  X received payments from its customers to remove their waste materials, recovered liquid products from those waste materials, and used those liquid products in creating a "Blend" that it transferred to various producers for their use as an energy source.  Id.  X paid the producers a "small fee per gallon" to use the Blend.  Id.  The IRS observed that "X's profit from the production of the Blend is equal to the difference between the payment X receives from its customers to remove their . . . waste and its costs of processing the waste (including the fees X pays to the user of the Blend)."  Id.  The IRS further explained that

> [t]he [Internal Revenue Code] does not define the term "sale" . . . .
> As generally used, however, the term includes a seller's transfer of
> title to property to a buyer for consideration.  In this case, X
> transfers title to the Blend . . . .  In exchange for this transfer, X
> receives a benefit, e.g., X is relieved from the duty associated with
> having to dispose of the Blend . . . .  In this example, it might cost
> X [an unspecified amount] per gallon to dispose of the Blend in a
> manner that conforms to environmental standards.  However, X
> can be relieved of this duty by paying a small fee to the . . .
> producer, who, in turn, disposes of the Blend by using it as a fuel.
> Thus, X sells the Blend to a person for use as a fuel.

Id.

In IRS Private Letter Ruling 9631012, the IRS considered a request for a ruling from X, which "operate[d] a trash removal service."  IRS Priv. Ltr. Rul. 9631012 (Aug. 2, 1996).  X used some of the waste materials that it collected from its customers to create a "Mixture."  Id.  X was "legally obligated to dispose of the waste materials contained in the Mixture."  Id.  X transferred title to the Mixture to certain producers and paid a fee to those producers to "dispose of the Mixture by using it as a fuel."  Id.  The IRS explained that

> [t]he [Internal Revenue Code] does not define the term "sale" . . . .
> However, the term "sale," as ordinarily used, means the passing of
> title from the seller to the buyer for a price, which can be payable
> in money or otherwise.  X transfers title to the Mixture to the . . .
> producers who will use the Mixture . . . and, in return, X receives

relief from its obligation to dispose of the waste.  Therefore, X
sells the Mixture for use as a fuel as part of X's business.

Id.

Both private letter rulings are distinguishable from the instant case.  The taxpayer in IRS
Private Letter Ruling 9229038 was in the waste management business and generated revenue by
charging its customers to remove their waste.  As such, it had an obligation to dispose of the
waste materials it acquired from its customers.  Although IRS Private Letter Ruling 9631012 is
silent regarding its taxpayer's revenue stream, the taxpayer operated a "trash removal service"
and similarly collected waste materials from its customers.  As such, it also had an obligation to
dispose of the waste materials it obtained.  In the instant case, although plaintiff may arguably
have been in the waste management business in a general sense, its business model focused on
creating alternative fuel mixtures, not on waste disposal.  Plaintiff viewed the entities from which
it acquired feedstock as suppliers, not customers, and paid those entities $2,154,568.45 to
"purchase[]" feedstock (rather than collecting revenue for such acquisitions).  Def.'s App. 326.
In other words, plaintiff's profit stream came from the alternative fuel mixtures it created and the
credits those mixtures generated, not from acquiring feedstock.  Therefore, the court concludes
that, to the extent that the private letter rulings cited by plaintiff may be relied on, they are
sufficiently distinguishable from the facts of the instant case to provide meaningful support.

Further, plaintiff's business model was not focused on waste management in the same
sense as the taxpayers in the aforementioned private letter rulings, and instead concentrated on
"selling" alternative fuel mixtures to its customers.  Notably, plaintiff does not argue that it used
the alternative fuel mixtures as fuel itself.  Thus, it is unclear whether plaintiff actually had an
obligation to dispose of the feedstock it acquired.

To the extent that plaintiff was under such a disposal obligation, plaintiff's payment of
money to be relieved of that obligation is a separate bargain from plaintiff's receipt of money in
exchange for the alternative fuel mixtures it delivered.  Plaintiff paid its customers valuable
consideration—$1,678,029.07—to assume the disposal obligation.  In other words, plaintiff
received relief from its disposal obligation (if it had one) in exchange for money paid that was
not de minimis.  This exchange was a bona fide transaction, unlike plaintiff's purported "sale" of
its alternative fuel mixtures to its customers for nominal amounts.  Of course, if plaintiff was not
under a disposal obligation, then any relief therefrom has no value and cannot be consideration to
support a sale.

### 3.  Summary

The court concludes that plaintiff did not sell its alternative fuel mixtures—an element
essential to plaintiff's claim and an issue on which plaintiff bears the burden of proof.
Accordingly, had the court not already done so, it would grant summary judgment in favor of
defendant with respect to plaintiff's entitlement to the alternative fuel mixture credits for 2011.

# IV.  EXCESSIVE CLAIM PENALTIES

Having concluded that plaintiff was not entitled to the alternative fuel mixture payments it received for 2011 (by claiming the alternative fuel mixture credits on Form 8849), the court must determine whether plaintiff is liable for the excessive claim penalties assessed by the IRS. Under I.R.C. § 6675, a taxpayer that makes a claim for an excessive alternative fuel mixture payment is liable for a penalty of 200% of the "excessive amount" unless the taxpayer can demonstrate "reasonable cause" for making its claim.  I.R.C. § 6675(a).  The "excessive amount" is that portion of the amount claimed that exceeds the amount allowable.  Id. § 6675(b).  Both the excessive amount itself and the excessive claim penalty may be assessed and collected in the same manner as if it were an excise tax under I.R.C. § 4081.  Id. § 6206.  Here, because plaintiff claimed $19,773,393.00 in alternative fuel mixture payments that it was not entitled to receive, it is liable for the $19,773,393.00 in tax and, unless it can show reasonable cause for making the claims, $39,546,786.00 in excessive claim penalties assessed by the IRS.

As observed by the parties, "reasonable cause" is not defined in I.R.C. § 6675. Therefore, the court "must examine analogous cases to determine the nature and scope of the 'reasonable cause' exception in [I.R.C.] § 6675."  J.J. Powell, Inc. v. United States, 125 Fed. Cl. 73, 86 (2013).  I.R.C. § 6664, for instance, provides a defense to certain accuracy-related penalties for taxpayers able to demonstrate reasonable cause and good faith.  See Estate of Liftin v. United States, 754 F.3d 975, 978-79 (Fed. Cir. 2014); Stobie Creek Invs. LLC v. United States, 608 F.3d 1366, 1381 (Fed. Cir. 2010).  Whether reasonable cause exists is a "question of fact decided on a case-by-case basis."  Stobie Creek, 608 F.3d at 1381.  The most important factor is "'the extent of the taxpayer's effort to assess the taxpayer's proper tax liability,' judged in light of the taxpayer's 'experience, knowledge, and education.'"  Id. (quoting Treas. Reg. § 1.6664-4(b)(1)).  The taxpayer bears the burden of demonstrating reasonable cause and that the IRS assessment was incorrect.  United States v. Boyle, 469 U.S. 241, 245 (1985); Conway v. United States, 326 F.3d 1268, 1278 (Fed. Cir. 2003).

Plaintiff argues that it had reasonable cause for claiming the alternative fuel mixture credits and concomitant payments primarily because it relied on the advice of Mr. Sanderson. Plaintiff also contends that it relied on the advice of Mr. Lewis, Ms. Albers, Dr. Zitomer, and the IRS.  The reliance defense is outlined in Stobie Creek:

> One way to show reasonable cause is to show reasonable reliance on the advice of a competent and independent professional adviser.  This advice must meet several requirements.  First, the taxpayer must show that the advice was based on all pertinent facts and circumstances and the law as it relates to those facts and circumstances.  Second, the advice relied upon must not be based on any unreasonable factual or legal assumptions, and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person.  Third, the taxpayer's reliance on the advice must itself be objectively reasonable.  The reasonableness of any reliance turns on the

> quality and objectivity of the advice.  Reliance is not reasonable,
> for example, if the adviser has an inherent conflict of interest about
> which the taxpayer knew or should have known.  Nor is it
> reasonable if the taxpayer knew or should have known that the
> transaction was too good to be true, based on all the circumstances,
> including the taxpayer's education, sophistication, business
> experience, and purposes for entering into the transaction.

608 F.3d at 1381-82 (citations and internal quotation marks omitted).  Defendant avers that plaintiff's reliance on Mr. Sanderson was unreasonable because Mr. Sanderson lacked a full understanding of plaintiff's operations, plaintiff disregarded portions of the advice Mr. Sanderson provided, and Mr. Sanderson was not disinterested because he had personally invested in various renewable energy projects.  Defendant also argues that Mr. Lewis, Ms. Albers, Dr. Zitomer, and the IRS did not provide any substantive advice to plaintiff and that, in any event, plaintiff knew its transactions were too good to be true and entered into the transactions at issue solely to obtain the alternative fuel mixture credit.

Because the court concluded that the product that plaintiff purported to sell to its customers was indeed an alternative fuel mixture, it need only examine the reasonableness of plaintiff's reliance on advice pertaining to (1) whether plaintiff's mixtures were actually sold and (2) whether plaintiff's mixtures were used as a fuel.

## A.  Plaintiff Did Not Reasonably Rely on Advice Concerning Sales

Plaintiff asserts that it relied on the advice of Mr. Sanderson, Mr. Lewis, and the IRS when concluding that its transactions were sales.  However, the IRS provided no advice, the advice from Mr. Lewis was merely cumulative, and plaintiff's reliance on Mr. Sanderson's advice was unreasonable.

## 1.  The IRS Did Not Provide Advice Regarding Sales

The IRS must "abate any portion of any penalty or addition to tax attributable to erroneous advice furnished to the taxpayer in writing by [the IRS]."  I.R.C. § 6404(f)(1) (emphasis added).  Such abatement is only available if "the written advice was reasonably relied upon by the taxpayer and was in response to a specific written request of the taxpayer" and there was no "failure by the taxpayer to provide adequate or accurate information."  Id. § 6404(f)(2) (emphasis added).

Plaintiff attempts to paint the IRS's approval of its "AM" registration and the fact that its registration was never revoked as advice from the IRS that its activities met the requirements for the alternative fuel mixture credit.  However, the registration approval notice does not constitute written advice.  Any written response from the IRS "shall constitute 'advice' if, and only if, the response applies the tax laws to the specific facts submitted in writing by the taxpayer and provides a conclusion regarding the tax treatment to be accorded the taxpayer upon the application of the tax law to those facts."  Treas. Reg. § 301.6404-3(c)(1).  While the IRS issued

the approval notice in response to plaintiff's application for registration, the notice merely indicated that plaintiff was registered as "an alternative fueler that produces an alternative fuel mixture that is sold for use." Pl.'s App. 80.  The IRS did not apply laws to specific facts to reach a conclusion.  Rather, the IRS issued the approval notice upon determining only that plaintiff was "regularly engaged" or "likely to be" engaged in a specified activity, Treas. Reg. § 48.4101-1(f)(2), not that plaintiff met or would meet the requirements for the alternative fuel mixture credit.  In any event, plaintiff had simply indicated on its Form 637 registration application that it would "sell [its] alternative fuel mixture." Pl.'s App. 78.  No details regarding the sales itself were provided.  Because the IRS "has no obligation to verify or correct the taxpayer's submitted information," Treas. Reg. § 301.6404-3(b)(4), it was not required to verify that plaintiff's transactions would actually constitute sales before approving plaintiff's application.  Therefore, to the extent that the approval notice contained an application of laws to facts, it was based on the incomplete and inaccurate information provided by plaintiff with respect to "sales."

In addition to the registration approval notice, plaintiff purports to rely on the advice that the IRS allegedly provided to Mr. Sanderson in his conversation with the IRS immediately following the issuance of the August 19, 2011 CCA.  Such reliance is inapposite because the August 19, 2011 CCA was silent with respect to sales.  Any information provided by the IRS in its conversation with Mr. Sanderson regarding the August 19, 2011 CCA could not have been advice—much less written advice—concerning whether plaintiff's transactions with its customers constituted sales.

## 2. Mr. Lewis's Advice Regarding Sales Was Merely Cumulative

In his deposition, Mr. Lewis candidly admitted that he was "reminded" by Mr. Sanderson that "consideration under Iowa law or [the] law of anywhere in the United States does not have to be cash" and that it could be "activities or benefits or detriments," and could include assuming "an obligation [upon transfer of possession and title] to dispose of [an alternative fuel mixture] in an environmentally correct way." Pl.'s App. 384 (Lewis Dep. 18:5-16).  Mr. Lewis then explained that he "use[d] that concept" in drafting customer agreements for plaintiff.  Id. at 385 (Lewis Dep. 19:18-22).  He further explained that he believed "transfer of the product . . . to the digester companies would be sufficient under the [Uniform Commercial Code] to be a sale" but that he "wasn't sure whether [plaintiff] needed more in the context of this esoteric tax issue." Id. at 387 (Lewis Dep. 73:3-12).  Mr. Lewis also remarked that his opinion that plaintiff's transactions constituted "sales" was not independent but was "supplemented by Mr. Sanderson's expertise" and that, although he "probably would have" given an independent opinion regarding sales, he "wasn't called to do that." Id. at 388-90 (Lewis Dep. 76:3-78:9).

Since Mr. Lewis, by his own admission, provided no independent advice to plaintiff regarding sales, there was no such advice on which plaintiff could reasonably rely.  The advice from Mr. Lewis was merely cumulative to the advice from Mr. Sanderson.

### 3.  Plaintiff's Reliance on Mr. Sanderson's Advice Regarding Sales Was Unreasonable

Mr. Sanderson was the primary expert upon which plaintiff relied.  However, plaintiff could not reasonably rely on Mr. Sanderson's advice concerning whether plaintiff's transactions constituted sales because Mr. Sanderson consistently qualified his advice and indicated that he did not have sufficient information.

Prior to plaintiff beginning operations, Mr. Sanderson described his experience with ethanol excise tax credits and advised plaintiff that transferring title from a seller to a buyer constituted a "sale" irrespective of how (or even whether) any money changed hands.  Mr. Sanderson also provided plaintiff with private letter rulings that could be interpreted as approving such arrangements as "sales."  At that juncture, it may have been reasonable for plaintiff to rely on such advice despite the nonprecedential nature of private letter rulings.

However, immediately prior to beginning operations, after plaintiff suggested that it would not charge customers for its alternative fuel mixtures, Mr. Sanderson referenced previous conversations in an electronic-mail message in which he advised plaintiff that "it presents a better case if you charge the user of the mixture _for the fuel value_" and remarked that he "[did] not have a full understanding of the economics" of plaintiff's business.  Def.'s App. 334 (emphasis added).  He also cautioned plaintiff that a private letter ruling was only binding on the recipient taxpayer and that such rulings could not be cited as precedent.  At that point, plaintiff's reliance on the private letter rulings became less reasonable.  In addition, even though it was permissible for the alternative fuel mixture credit to supply the profit motive for plaintiff's business, plaintiff could not reasonably rely upon advice with respect to whether its transactions constituted sales when its adviser specified that he lacked a full understanding of the economics.  Further, plaintiff ignored Mr. Sanderson's advice to charge its customers for the fuel value when it instead charged its customers a flat fee for an undefined amount of its alternative fuel mixtures.

Later that year, Messrs. Carter and Sanderson discussed BioBeast and whether certain products would qualify as biomass.  In a May 2, 2011 electronic-mail message, Mr. Sanderson simply provided the statutory definitions of alternative fuel and biomass, listed the requirements of claiming the alternative fuel mixture credit, and emphasized that he "[did] not have enough facts or understand [plaintiff's] operations well enough to give [plaintiff] any more specific advice."  Id. at 338.  Notably, Mr. Sanderson did not opine on whether plaintiff's transactions qualified as sales.

Approximately three months later, in late July 2011, Mr. Sanderson asked Mr. Huyser "[w]hich credit [plaintiff was] trying to claim:  the mixture credit for liquid biomass and diesel, or compressed liqu[e]fied biogas?"  Id. at 404.  Although the "sales" requirement was identical for each type of alternative fuel mixture credit, see I.R.C. § 6426(d)(2), (e), confusion regarding the fundamental nature of the credit—more than halfway through the year—should have given plaintiff pause, particularly given the sophistication of plaintiff's members.

Finally, plaintiff never obtained a formal tax opinion from Mr. Sanderson even though he offered to provide one.  While a formal, written opinion is not always required, <u>see, e.g.</u>, <u>Allison v. United States</u>, 80 Fed. Cl. 568, 598 (2008), the court concludes that a "reasonable and ordinarily prudent person[]," <u>id.</u>, claiming millions of dollars in tax credits would have sought a formal tax opinion.  Such an opinion would have required Mr. Sanderson to refrain from, among other requirements:

- basing "written advice on unreasonable factual or legal assumptions,"

- "unreasonably" relying on "representations, statements, findings[,] or agreements of [plaintiff] or any other person," or

- failing to "consider all relevant facts" that he knew or should have known.

31 C.F.R. § 10.37(a) (2010) (reproduced in IRS Circular 230).  In other words, Mr. Sanderson would have been required to fully investigate plaintiff's operations prior to issuing a formal tax opinion, and would not have been able to qualify such an opinion with statements indicating that he had less than a full understanding or was unclear with respect to which credit plaintiff was attempting to claim.  Mr. Kinley, one of plaintiff's members, was actively involved in the business management, was astute enough to exercise due diligence prior to investing in plaintiff, and was a CPA.  As such, Mr. Kinley would have also been aware of Circular 230's requirements regarding written opinions.

In short, plaintiff's primary adviser could not unambiguously endorse plaintiff's business model as late as July 2011—after plaintiff had already claimed millions in alternative fuel mixture credits but had yet to claim millions more.  Therefore, it was unreasonable for plaintiff to rely on the advice given by Mr. Sanderson, and plaintiff's failure to obtain a formal tax opinion (from either Mr. Sanderson or another qualified, independent professional) after one had been offered is similarly unreasonable.  To the extent that it may have been reasonable for plaintiff to rely on the advice that Mr. Sanderson provided with respect to whether plaintiff's transactions qualified as sales, plaintiff failed to so rely when it ignored the advice to charge for the value of the fuel.

### 4.  Summary

Plaintiff did not reasonably rely on the advice provided by its advisers with respect to whether its transactions qualified as sales.  Therefore, the court concludes that plaintiff cannot establish reasonable cause for its excessive claims.  Accordingly, the court must grant summary judgment in favor of defendant with respect to the I.R.C. § 6675 excessive claim penalties.

**B.  Plaintiff Did Not Reasonably Rely on Advice Concerning the "Use as a Fuel" Requirement**

Because plaintiff cannot establish that it reasonably relied on its advisers with respect to whether its alternative fuel mixtures were sold, it is immaterial whether plaintiff can establish that it reasonably relied on its advisers with respect to whether its alternative fuel mixtures were used as a fuel by its customers.  However, to the extent that plaintiff can establish reasonable reliance regarding sales, it would still be liable for the excessive claims penalties because it cannot establish reasonable reliance regarding the "use as a fuel" requirement.

As with whether its alternative fuel mixtures were sold, plaintiff argues that it primarily relied on the advice of Mr. Sanderson for the proposition that its alternative fuel mixtures were "use[d] as a fuel" by its customers.  Plaintiff also contends that it relied, to a lesser extent, on the advice of Mr. Lewis, Ms. Albers, Dr. Zitomer, and the IRS.  However, any such reliance was unreasonable.

**1.  The IRS Did Not Provide Advice Regarding the "Use as a Fuel" Requirement**

The IRS did not provide plaintiff advice regarding whether plaintiff's alternative fuel mixtures were used as a fuel.  The IRS's approval of (and subsequent failure to revoke) plaintiff's registration did not constitute advice for the reasons discussed above, which need not be repeated.  See supra Section IV.A.1.  To the extent that there was any such advice, taxpayers may not rely on advice that "relates to a continuing action or series of actions" once the "taxpayer is put on notice that the advice is no longer consistent with the [IRS's] position and, thus, no longer valid."  Treas. Reg. § 301.6404-3(b)(2)(v).  Plaintiff was "on notice" that the IRS did not consider alternative fuel mixtures to be "used as a fuel" in the anaerobic digestion process upon publication of the August 19, 2011 CCA, and therefore plaintiff could not rely on any previous "advice" from the IRS after that point.  See id.

Plaintiff also purports to rely on the oral advice to continue claiming the credits that the IRS allegedly provided to Mr. Sanderson in his conversation with the IRS immediately following publication of the August 19, 2011 CCA.  Such reliance is inapposite both because the advice was not written and because the advice was not substantive.  According to Mr. Sanderson, the IRS advised that plaintiff could continue claiming the credits because the IRS planned to "audit everyone."  Pl.'s App. 289 (Sanderson Dep. 119:1-9).  There was no analysis of plaintiff's operations or application of the law to plaintiff's unique facts.  The only "advice" given was that all claimants would be required to prove their eligibility for the credits during an eventual audit.  Such advice cannot be reasonably relied upon as justification for claiming those credits.

**2.  Ms. Albers Did Not Provide Any Substantive Advice**

Plaintiff also contends that Ms. Albers "review[ed] the documentation to support [plaintiff's] claims for tax credits" before filing the claims with the IRS after she "reviewed and analyzed the tax code and regulations and made an independent determination that the claims for tax credits submitted by [plaintiff] complied with the law and so advised the representatives of

[plaintiff]."  Pl.'s Mot. 26.  Defendant avers that Ms. Albers "was not hired to provide advice" to plaintiff and that her involvement "consisted of bookkeeping."  Def.'s Opp'n 35.

The court agrees with defendant that Ms. Albers did not provide "advice" to plaintiff and that her work more closely resembled bookkeeping than tax advice.  "The mere fact that a [CPA] has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein."  Neonatology Assocs., P.A. v. Comm'r, 115 T.C. 43, 100 (2000).  There is no evidence to suggest that Ms. Albers reviewed whether the alternative fuel mixtures provided by plaintiff were used by its customers as fuel.  Moreover, Ms. Albers was not hired to provide advice and was unable to recall doing so.  Therefore, there was no advice provided by Ms. Albers upon which plaintiff could rely.

### 3.  Mr. Lewis Did Not Provide Advice Regarding the "Use as a Fuel" Requirement

Mr. Lewis's chief role was to verify Mr. Sanderson's credentials and advise Mr. Huyser regarding the credibility and reasonableness of "Mr. Sanderson's conclusions and advice related to [plaintiff's] qualifications for the tax credits . . . ."  Pl.'s Mot. 26.  Mr. Lewis also assisted in drafting plaintiff's customer agreements and advised plaintiff regarding whether its transactions qualified as sales.  See supra Section IV.A.2.  Mr. Lewis was not asked to provide advice concerning the "use as a fuel" requirement.  In any event, he provided no independent advice for the reasons stated above, which need not be repeated.  See id.  Therefore, plaintiff could not have reasonably relied on any such advice that Mr. Lewis did provide.

### 4.  Plaintiff Did Not Rely on Advice From Dr. Zitomer When It Began Claiming Credits

Plaintiff asserts that Dr. Zitomer "provided advice on increasing the efficiency of the fuel being provided to the anaerobic digesters and confirmed [plaintiff's] understanding that the mixture being provided to the digesters was being used as a fuel."  Pl.'s Mot. 25 (emphasis added).  In so asserting, plaintiff appears to conflate the concepts of "fuel" and "used as a fuel."  Simply because a particular mixture qualifies as a fuel does not mean it is necessarily used as such.  For instance, Dr. Zitomer observed that if biogas produced from a particular mixture was flared, then it was not being used as a fuel.  Further, Dr. Zitomer recalled being asked whether plaintiff's mixtures were liquid and whether they were fuels, but could not recall being "specifically asked to opine on whether [plaintiff's alternative fuel mixtures] were used as fuels."  Pl.'s App. 337 (Zitomer Dep. 49:6-12) (emphasis added).

Dr. Zitomer advised plaintiff primarily with respect to whether its mixtures were indeed alternative fuel mixtures and could be used as a fuel in the anaerobic digestion process, not whether the mixtures were actually used as a fuel.  In any event, Dr. Zitomer did not begin working with plaintiff until after plaintiff had already been claiming the alternative fuel mixture credits.  Therefore, Dr. Zitomer did not provide any advice to plaintiff upon which it could rely with respect to whether its alternative fuel mixtures were, in fact, used as a fuel.

**5. Plaintiff's Reliance on Mr. Sanderson's Advice Regarding the "Use as a Fuel" Requirement Was Unreasonable**

Plaintiff could not reasonably rely on Mr. Sanderson's advice concerning whether plaintiff's alternative fuel mixtures were actually used as a fuel because, similar to his advice with respect to whether plaintiff's transactions constituted sales, see supra Section IV.A.3, Mr. Sanderson consistently qualified his advice and indicated that he did not have sufficient information.

Prior to plaintiff beginning operations, Mr. Sanderson advised plaintiff to adhere to the requirements of the alternative fuel mixture credit by seeking out customers that would be generating heat and electricity. Although he was informed that plaintiff's customers were doing so, he admitted that he was not familiar with the customers' operations. His lack of familiarity with the specifics of the customers' operations shows that he did not actually know whether plaintiff's customers were producing heat and electricity. In essence, plaintiff's reliance on Mr. Sanderson with respect to whether its alternative fuel mixtures were actually used as a fuel by its customers amounts to circular logic: plaintiff argues that it relied on Mr. Sanderson for its belief that its alternative fuel mixtures were used as a fuel, but Mr. Sanderson's understanding in that regard came solely from being told, by plaintiff, that its alternative fuel mixtures were so used.

In addition, Mr. Sanderson's advice concerning plaintiff's registration is of no moment. That advice was given in July 2010, long before plaintiff actually began providing its alternative fuel mixtures to its customers, and was merely indicative of plaintiff's planned activities, not on what actually occurred.

Further, Mr. Sanderson demonstrated a lack of understanding regarding the nuances of the anaerobic digestion process that rendered plaintiff's reliance on his advice unreasonable. In late January 2011, as plaintiff was beginning operations, Mr. Sanderson averred that the BTU value of plaintiff's alternative fuel mixtures should be "sufficient to create heat or energy when combusted or oxidized" and that it would be problematic if its alternative fuel mixtures were unable to "produce heat or energy in excess of that required to evaporate the moisture." Def.'s App. 334. Any advice that Mr. Sanderson gave at that point with respect to whether plaintiff's alternative mixtures were used as a fuel in the anaerobic digestion process was unreliable because, as Mr. Sanderson himself later acknowledged, the anaerobic digestion process is distinct from combustion and oxidation—further demonstrating his lack of familiarity with plaintiff's customers. Moreover, although plaintiff was informed that there needed to be a net production of energy with respect to the entire multistep process, it ignored that advice, as reflected by its failure to seek testing or verification of the energy produced by its mixtures.

As late as May 2011, Mr. Sanderson advised plaintiff that its feedstock had to be a liquid fuel derived from biomass that was either used as a fuel by plaintiff or sold to others for use as a fuel. Instead of analyzing whether plaintiff's alternative fuel mixtures were actually used as a fuel, Mr. Sanderson simply stated that he "[did] not have enough facts or understand [plaintiff's] operations well enough to [provide] any more specific advice." Id. at 338. Later, in July 2011,

Mr. Sanderson specifically asked Mr. Huyser how plaintiff's alternative fuel mixtures were used as a fuel.

Finally, as noted above, plaintiff's failure to obtain a formal tax opinion was unreasonable given the totality of the facts and circumstances.  See supra Section IV.A.3.

In short, plaintiff's primary adviser could not unambiguously endorse plaintiff's operations as late as July 2011—after plaintiff had already claimed millions in tax credits but had yet to claim millions more.  Therefore, it was unreasonable for plaintiff to rely on the advice given by Mr. Sanderson.  To the extent that it may have been reasonable for plaintiff to rely on the advice that Mr. Sanderson provided with respect to whether plaintiff's alternative fuel mixtures were used as a fuel, plaintiff failed to so rely by failing to verify, through testing, that use of its mixtures actually resulted in a net production of energy.

### 6. Summary

Plaintiff did not reasonably rely on the advice provided by its advisers with respect to whether its alternative fuel mixtures were actually used as a fuel.  Therefore, the court concludes that plaintiff cannot establish reasonable cause for its excessive claims.  Accordingly, had the court not already done so, it would grant summary judgment in favor of defendant with respect to the I.R.C. § 6675 excessive claim penalties assessed by the IRS.

## V.  FRAUD, FAILURE-TO-FILE, AND FAILURE-TO-PAY PENALTIES

In addition to seeking abatement of the assessments for the alternative fuel mixture credits claimed and the I.R.C. § 6675 excessive claims penalty, plaintiff seeks abatement of the I.R.C. § 6651(a)(1) failure-to-file, I.R.C. § 6651(a)(3) failure-to-pay, and the I.R.C. § 6663 civil fraud penalties assessed by the IRS.

In a November 4, 2016 letter, the United States Department of Justice ("DOJ") advised plaintiff that a partial concession in this case had been approved.  Specifically, "an authorized delegate of the Attorney General . . . authorized abatements of the § 6663 fraud penalties, § 6651(a)(1) failure to file penalties, and § 6651(a)(3) failure to pay penalties" that the IRS assessed against plaintiff for 2011.  Pl.'s App. 93.  Accordingly, the DOJ authorized the IRS to abate the penalties.

To the extent that the civil fraud, failure-to-file, and failure-to-pay penalties have already been abated, the court must dismiss plaintiff's claim for abatement as moot.  To the extent that the civil fraud, failure-to-file, and failure-to-pay penalties have not been abated, the court must grant summary judgment in plaintiff's favor with respect to those penalties.

## VI.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or are unnecessary for resolving the matters currently before the court.

There is no genuine issue of material fact.  Although plaintiff's products appear to qualify as alternative fuel mixtures, plaintiff cannot prove that they were used as a fuel.  In addition, plaintiff did not sell its alternative fuel mixtures.  Therefore, plaintiff is not entitled to the alternative fuel mixture credits that it claimed.  Further, plaintiff is not entitled to the abatement of the excessive claim penalties assessed by the IRS because it did not reasonably rely on its advisers with respect to whether its alternative fuel mixtures were sold to its customers or used as a fuel.  However, plaintiff is entitled to the abatement of the civil fraud, failure-to-file, and failure-to-pay penalties assessed by the IRS.

Accordingly, with respect to plaintiff's claim for abatement of the civil fraud, failure-to-file, and failure-to-pay penalties, the court **DISMISSES** the claim as **MOOT** to the extent that the penalties have been abated and **GRANTS** plaintiff's motion for summary judgment to the extent that the penalties have not yet been abated.  With respect to plaintiff's remaining claims, the court **DENIES** plaintiff's motion for summary judgment and **GRANTS** defendant's cross-motion for summary judgment.  No costs.

The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge