# In the United States Court of Federal Claims

No. 15-155T
(Filed: July 2, 2018)

| | |
|---|---|
| ALTERNATIVE CARBON RESOURCES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Motion to Stay Execution of Judgment Pending Appeal; Hilton; Standard Havens; Dillon; Likelihood of Success on the Merits; Substantial Case; Balance of Harms |

William Sidney Smith, Des Moines, IA, for plaintiff.

Miranda Bureau, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

The parties in this case dispute the propriety of refundable alternative fuel mixture credits that plaintiff Alternative Carbon Resources, LLC claimed for 2011 pursuant to section 6426(e) of the Internal Revenue Code ("I.R.C."). After plaintiff claimed the credits, the Internal Revenue Service ("IRS") determined that plaintiff did not qualify for them and thus sought to recover the payments it made to plaintiff, along with various penalties and interest. On March 22, 2018, the court determined that plaintiff was "not entitled to the alternative fuel mixture credits that it claimed" and was "not entitled to abatement of the excessive claim penalties assessed by the IRS." Alt. Carbon Res., LLC v. United States, 137 Fed. Cl. 1, 37 (2018), appeal docketed, No. 2018-1948 (Fed. Cir. May 10, 2018). Judgment was entered in favor of defendant in the amount of $59,320,179 on March 28, 2018. Am. J., ECF No. 47.

Currently before the court is plaintiff's motion to stay execution of the judgment pending the outcome of its appeal. As explained below, plaintiff has failed to demonstrate a likelihood of success on the merits or even a substantial case. Therefore, its motion must be denied.

## I. BACKGROUND

A detailed description of the statutory and regular context, factual background, and procedural history of this case is included in the court's summary judgment ruling and need not be repeated herein. See Alt. Carbon, 137 Fed. Cl. at 4-21. Only a brief summary is necessary here.

In 2011, the alternative fuel mixture credit was available to taxpayers that blended liquid fuel derived from biomass and at least 0.1% diesel fuel into a mixture that was used as a fuel or sold for use as a fuel, provided that the taxpayer was properly registered. The credit could be received as either a credit (against excise tax or income tax liability) or as a payment. Payments were treated as overpayments of tax for all purposes, including examination authority and assessment of penalties and interest. Claims that exceeded the allowable amount were subject to a 200% excessive claims penalty unless the taxpayer could demonstrate reasonable cause for making the claims.

Prior to forming plaintiff as an entity, two of plaintiff's principals investigated the feasibility of using waste byproducts from ethanol and food plants, particularly corn syrup, as an alternative fuel in anaerobic digesters. Anaerobic digesters are used to produce methane gas, which is then used in generators to produce electricity, used in boilers to produce heat, sold, or flared (i.e., burned off).[1] Plaintiff's principals contacted Greg Sanderson, a nationally recognized attorney specializing in energy tax credits, who indicated that their idea had merit.

Plaintiff continued to work with Mr. Sanderson and ultimately developed a business model that involved three main steps. First, plaintiff would purchase feedstock from a supplier. Next, the requisite amount of diesel fuel was added to create an alternative fuel mixture. Finally, the mixture was delivered to the anaerobic digester customers. Plaintiff applied for, and received, an IRS registration designating plaintiff as a producer of an alternative fuel mixture that was sold for use. As part of the application process, plaintiff emphasized to the IRS that it planned to blend the liquid fuel from biomass with taxable fuel and sell the mixture to a third party to use as a fuel in a process to manufacture methane gas.

Plaintiff charged its customers various nominal amounts for the alternative fuel mixture. In turn, the digester customers charged plaintiff a "tipping fee" to take the fuel based on the quantity delivered. The nominal amounts charged were typically one-time, flat fees for the total quantity of alternative fuel mixtures that plaintiff would deliver over the course of the year. For example, plaintiff charged its main customer, the Des Moines Wastewater Reclamation Authority ("WRA"), a one-time fee of $950 for the entire amount of the alternative fuel mixtures it would deliver during 2011, limited to 50,000 gallons per day, while plaintiff simultaneously paid the WRA a disposal (i.e., "tipping") fee of $0.02634 per gallon plus sales tax. Plaintiff also paid the WRA a $950 administrative fee specifically to offset the $950 charge for the alternative fuel mixtures. Altogether, plaintiff received $8,950 of income for the purchase of its alternative fuel mixtures (on which it did not charge sales tax) and paid its customers approximately $1.7

[1] Methane gas can also be cleaned and converted into compressed natural gas.

million in disposal fees. The tax credit incentives—approximately $19.8 million altogether—allowed plaintiff's business to be profitable while plaintiff built demand for its alternative fuel mixtures.

Mr. Sanderson had advised plaintiff that IRS private letter rulings indicated that tipping-fee transactions qualified as sales, but cautioned that private letter rulings could not technically be cited as precedent, reminded plaintiff that it would be audited and would need to prove its eligibility for the credits it claimed, and remarked that plaintiff would be in a better position if it charged its customers a sales price based on the fuel value rather than a flat amount. He also emphasized that plaintiff should seek out customers that would be generating heat and electricity because the alternative fuel mixture credit was designed to promote energy generation; although Mr. Sanderson was informed that plaintiff's customers would be using the alternative fuel mixtures accordingly, he lacked any further knowledge of the customers' operations.

After plaintiff began operations, it worked to develop its own alternative fuel, named BioBeast. In May 2011, after being asked by plaintiff whether BioBeast would qualify for the alternative fuel mixture credit, Mr. Sanderson simply listed the requirements for the alternative fuel mixture credit and indicated that he did not have enough facts or understand plaintiff's operations well enough to give any more specific advice. In July 2011, Mr. Sanderson assisted plaintiff in responding to an IRS questionnaire. Mr. Sanderson suggested that more details were needed in several sections of plaintiff's response, expressed confusion regarding which alternative energy credit plaintiff was attempting to claim, and asked how plaintiff's alternative fuel mixture was used as a fuel by its customers. In August 2011, the IRS issued a Chief Counsel Advisory in which the author opined that use of an alternative fuel mixture in the anaerobic digestion process does not constitute use as a fuel because the digester itself does not produce energy. Mr. Sanderson asserts that an official in the IRS excise tax division orally advised him that plaintiff should continue to claim the credits unless its registration had been revoked because the IRS would be collecting questionnaires and conducting audits. Mr. Sanderson then advised plaintiff that it might "have a fight" regarding the credits but that he continued to believe plaintiff qualified. Ultimately, Mr. Sanderson was the primary expert that plaintiff relied on related to qualifying for the alternative fuel mixture credit. However, although Mr. Sanderson offered to provide a formal tax opinion regarding plaintiff's eligibility for the credits, no such opinion was ever requested.

In March 2012, the IRS conducted an initial audit of plaintiff's claims for the alternative fuel mixture credit. As relevant to the instant motion, the IRS eventually determined that plaintiff was not entitled to the alternative fuel mixture credits that it had received as payments. On April 18, 2014, the IRS assessed a total of $19,773,393 as tax to recoup the payments made to plaintiff for 2011 and $39,546,786 in excessive claim penalties. In June 2014, plaintiff made directed payments for portions of the tax and penalty assessments and filed claims for refund of its directed payments and abatement of the remaining portions of the assessments.

After receiving no response from the IRS regarding its claims for refund, plaintiff filed suit in this court on February 18, 2015, arguing generally that it was entitled to the alternative fuel mixture credits and that, even if it did not qualify for the credits, it was not liable for the

excessive claim penalties because it reasonably relied on the advice of Mr. Sanderson and others. Defendant then asserted counterclaims for the tax and excessive claim penalty assessments. The parties conducted discovery and filed cross-motions for summary judgment.

In their cross-motions, the parties did not dispute that plaintiff was properly registered, plaintiff's mixtures were derived from biomass, and plaintiff's mixtures contained the requisite 0.1% diesel fuel. With respect to the disputed aspects of plaintiff's entitlement to the alternative fuel mixture credits, the court concluded that (1) plaintiff's mixtures were both liquid and capable of being used as a fuel, and thus constituted liquid fuels and, because they were derived from biomass, alternative fuel mixtures; (2) plaintiff could not prove that its alternative fuel mixtures were actually used as a fuel; and (3) although it was permissible for the alternative fuel mixture credit to supply the profit motive for plaintiff's business model, plaintiff's transactions were not bona fide sales. The court further concluded that plaintiff did not reasonably rely on advice pertaining to whether its mixtures were actually sold or used as a fuel; because the court had concluded that plaintiff's products were indeed alternative fuel mixtures, it was immaterial whether plaintiff's reliance on its advisers in that regard was reasonable. In short, the court concluded that plaintiff did not qualify for the alternative fuel mixture credits and was liable for the excessive claim penalties. Accordingly, the court granted defendant's cross-motion for summary judgment. On March 28, 2018, judgment was entered

> in favor of defendant on its counterclaim in the amount of $59,320,179.00—for excise taxes assessed pursuant to I.R.C. §§ 6206 and 6427 in the amount of $19,773,393.00 and for excessive claim penalties assessed pursuant to I.R.C. §§ 6206 and 6675 in the amount of $39,546,786.00—less payments made, plus statutory interest and additions according to law.

Am. J.

Plaintiff filed the instant motion on May 2, 2018, requesting that the court stay the execution of its judgment pending appeal and, in doing so, waive the requirement that it post a bond in the amount of the judgment. Plaintiff then filed a notice of appeal on May 3, 2018. Plaintiff's motion is now fully briefed, and the court deems oral argument unnecessary.

## II. LEGAL STANDARDS

"Unless a court issues a stay, a trial court's judgment . . . normally takes effect despite a pending appeal." Coleman v. Tollefson, 135 S. Ct. 1759, 1764 (2015). A stay of execution of a judgment pending appeal "is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." Nken v. Holder, 556 U.S. 418, 427 (2009) (internal quotation marks omitted). Therefore, courts should not "reflexively hold[] a final order in abeyance pending review." Id. Nevertheless, it is well settled that the power to stay execution of a judgment pending appeal is "part of [a court's] traditional equipment for the administration of justice." Scripps-Howard Radio v. FCC, 316 U.S. 4, 9-10 (1942).

Pursuant to Rule 8(a)(1)(A) of the Federal Rules of Appellate Procedure ("FRAP"), a motion to stay execution of the trial court's judgment pending appeal must first be filed in the trial court.[2] See also Wolfchild v. United States, 108 Fed. Cl. 578, 583 (2013) ("Notwithstanding the pendency of an appeal, a motion for stay should first be filed in the trial court."). If the trial court denies the motion (or filing the motion in the trial court would be "impracticable"), then the applicant may seek the same relief in the appellate court. FRAP 8(a)(2)(A); see also Fed. Cir. R. 8(d) (allowing a litigant who filed an initial motion to stay execution of the judgment with the trial court to seek the same relief from the Federal Circuit if the "motion remains pending [and] it is not practicable to await a ruling" on the motion).

RCFC 62(d) allows an applicant to obtain a stay of execution of the judgment by posting a supersedeas bond; such a stay becomes effective upon court approval of the bond. See Becker v. United States, 451 U.S. 1306, 1308 (1981) (describing FRCP 62(d) as supplying "automatic stay" provisions); ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., Nos. 2011-1567 et al., 2012 WL 10716768, at *1 (Fed. Cir. 2012) (describing a stay of judgment that is obtained pursuant to FRCP 62(d) as a "matter of right") (unpublished per curiam order); Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1232 (10th Cir. 2009) (observing that the appellant "would have the right to stay execution on the judgment by filing a supersedeas bond" pursuant to FRCP 62(d) if "only a money judgment" was involved). "The purpose of a supersedeas bond is to secure the [judgment creditor] from a loss resulting from the stay of execution . . . ." Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1505 n.1 (9th Cir. 1987); accord Lightfoot v. Walker, 797 F.2d 505, 506-07 (7th Cir. 1986) ("The philosophy underlying Rule 62(d) is that a [litigant] who has won in the trial court should not be put to the expense of defending [its] judgment on appeal unless the [judgment debtor] takes reasonable steps to assure that the judgment will be paid if it is affirmed.").

A court may, in exercising its discretion, waive the requirement of such a bond. Dillon v. City of Chicago, 866 F.2d 902, 904-05 (7th Cir. 1988); Wunschel & Small, Inc. v. United States, 1 Cl. Ct. 101, 102 (1983). However, such discretion is "limited" and "must be exercised sparingly and with due regard for the interest of the [judgment creditor] in securing prompt and certain satisfaction of its judgment." Wunschel, 1 Cl. Ct. at 102; accord id. ("The requirement of a full supersedeas bond may thus be waived or modified only upon a showing by the [judgment debtor] that the posting of security is not practicable and that the waiver or modification will not impair the [judgment creditor's] ability to collect its judgment.").

---

[2] In the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), references to "district court" and "trial court" in the FRAP are deemed to include the United States Court of Federal Claims. Fed. Cir. R. 1(a)(1)(C). Similarly, references in the FRAP to the Federal Rules of Civil Procedure ("FRCP") are deemed to include the "analogous rules" contained within the Rules of the United States Court of Federal Claims ("RCFC"). Fed. Cir. R. 1(b)(1). Further, it is well settled that "interpretation of the [RCFC] will be guided by case law and the Advisory Committee Notes that accompany the [FRCP]." RCFC 2002 Rules Comm. Note; accord Zoltek Corp. v. United States, 71 Fed. Cl. 160, 167 (2006) (observing that "interpretation of the [FRCP] informs the Court's analysis" of the RCFC).

In determining whether to exercise its discretion to grant a stay of execution of the judgment pending appeal without requiring the judgment debtor to post a supersedeas bond for the full amount of the judgment, a court must weigh four factors:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits;
>
> (2) whether the applicant will be irreparably injured absent a stay;
>
> (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and
>
> (4) where the public interest lies.

Hilton v. Braunskill, 481 U.S. 770, 776 (1987), quoted in Standard Havens Prods., Inc. v. Gencor Indus., Inc., 897 F.2d 511, 512 (Fed. Cir. 1990). The factors "contemplate individualized judgments in each case," and therefore "cannot be reduced to a set of rigid rules." Id. at 777. In other words, the factors are "not necessarily entitled to equal weight" and are analyzed using a "flexible" approach. Akima Intra-Data, LLC v. United States, 120 Fed. Cl. 25, 28 (2015). "The first two factors are the most critical, and invariably the stay applicant must demonstrate more than a mere possibility of relief." Beard v. United States, 101 Fed. Cl. 100, 103 (2011) (internal quotation marks and alterations omitted). However, a "strong showing" of a likelihood of success on the merits is unnecessary "[w]hen harm to the applicant is great enough." Standard Havens, 897 F.2d at 513. Rather, a stay is appropriate when the applicant can "demonstrate a substantial case on the merits, provided the other factors militate in the [applicant's] favor." Id. (internal quotation marks and emphases omitted).

The Hilton and Standard Havens factors are properly applicable to cases involving money judgments. See, e.g., Interactive Health, LLC v. King Kong USA, Inc., Nos. 2009-1141, 2009-1155, 2009 WL 1228489, at *1 (Fed. Cir. May 1, 2009) (unpublished decision); Eon-Net, L.P. v. Flagstar Bancorp, Inc., 222 F. App'x 970, 971-72 (Fed. Cir. 2007) (unpublished decision). Accordingly, they are the appropriate lens under which to evaluate plaintiff's motion. Further, because the standard "for determining whether a stay should be ordered is the standard that is used in weighing an application for a preliminary injunction," Nken, 556 U.S. at 442, it is appropriate to look to case law analyzing applications for injunctive relief when evaluating plaintiff's motion.

## III. ANALYSIS

### A. Likelihood of Success on the Merits

The court first considers whether plaintiff is likely to succeed on the merits of its appeal. As noted above, plaintiff must demonstrate "more than a mere possibility" of success. Id. at 434 (internal quotation marks omitted). Rather, plaintiff must show that there is at least "a fair prospect" that the Federal Circuit will overturn this court's summary judgment ruling. Conkright v. Frommert, 556 U.S. 1401, 1402 (2009) (Ginsburg, J., in chambers). Plaintiff argues that the court erred in (1) applying the economic substance doctrine rather than following "the definition of sale contained in private letter rulings" that approved of tipping-fee transactions, (2) interpreting the "use as a fuel" requirement in I.R.C. § 6426(e) to require "the additional element of a quantifiable net production of energy," and (3) concluding that plaintiff's reliance on IRS employees, "other IRS material," and the "advice of competent tax counsel" did not amount to reasonable cause for claiming the credits at issue. Mot. Stay Execution J. Pending Appeal ("Mot.") 6, ECF No. 48.

#### 1. Entitlement to the Credits

The court concluded that plaintiff was not entitled to the credits for two independent reasons: (1) plaintiff did not "sell" its alternative fuel mixtures and (2) plaintiff could not prove that its alternative fuel mixtures were "used as a fuel." Alt. Carbon, 137 Fed. Cl. at 26. Either reason, standing alone, was sufficient for the IRS to disallow the credits.

##### a. Definition of "Sale"

With respect to sales, plaintiff presents the same two-fold argument that it did at the summary judgment stage: that two private letter rulings approved of tipping-fee transactions and that its transactions were not required to have substance.[3]

Plaintiff contends that "Congress specifically exempted alternative energy tax incentives" from the economic substance doctrine, which is codified at I.R.C. § 7701(o). Mot. 9. Plaintiff fails to cite to any such statutory, regulatory, or other exemption, and instead simply (1) mischaracterizes various congressional statements, court decisions, and IRS guidance and (2) conflates profitability and substance. Plaintiff emphasizes that "alternative energy credits . . . may not be disallowed for lack of pre-tax profits" and that it is permissible for the credits to supply the profit motive. Id. However, plaintiff's reliance on the Joint Committee on Taxation's technical explanation that "it is not intended that [energy credits] be disallowed in a transaction pursuant to which, in form and substance, a taxpayer . . . undertakes the type of activity that the credit was intended to encourage," id. (emphasis added) (internal quotation marks omitted), undermines its position regarding the inapplicability of the economic substance doctrine. The committee's statement teaches that tax credits can supply the profit motive provided that the

[3] Plaintiff does not appear to argue that its transactions actually constituted bona fide sales independent of relying on the private letter rulings.)

transactions at issue follow what Congress intended. In other words, sales transactions need not necessarily be profitable to have economic substance; profitability and substance are distinct (albeit often related) concepts. Indeed, the court previously explained that "while plaintiff is correct that it need not show that its business model was profitable absent the alternative fuel mixture payments, plaintiff cannot escape the requirement that its business model must substantively align with Congressional intent." Alt. Carbon, 137 Fed. Cl. at 26 (citation omitted). Plaintiff's argument to the contrary—that "the legislative history is clear that energy tax credits are not subject to the economic substance doctrine," Mot. 15—is meritless.

The court concluded that plaintiff's transactions lacked substance because they were not bona fide sales—their actual profitability was irrelevant. The $950 "sales" transaction with the WRA, for instance, was a quintessential sham since it was entered into for the sole purpose of obtaining the tax credit, and was offset by a corresponding administrative fee. Moreover, none of the other "sales" prices that plaintiff charged was shown to "have an independent business purpose" beyond qualifying for the tax credit, Alt. Carbon, 137 Fed. Cl. at 28, such as being based on the value or quantity of the mixtures transferred. The fact that plaintiff did not collect sales tax on any of its transactions further supports such a conclusion.

In short, plaintiff has failed to show that the court erred either in concluding that the economic substance doctrine was applicable or in its actual application of the economic substance doctrine to the facts.

Further, plaintiff has failed to show that the court erred in concluding that "plaintiff impermissibly attempts to rely on the specified private letter rulings" as persuasive authority. Id. at 29. Plaintiff simply states that the private letter rulings apply and then analogizes them to the facts of the instant case, and thus appears to imply that the court erred in not considering the private letter rulings. However, contrary to plaintiff's implication, the court analyzed the private letter rulings and determined that "[t]o the extent that the private letter rulings relied upon by plaintiff constitute persuasive authority, they do not support plaintiff's position" because they address factual scenarios that are sufficiently distinguishable from those presented in the instant case. Id.

**b. "Used as a Fuel" Requirement**

Plaintiff also states that the court erred in determining that it needed to "show a 'net production of energy,' or to otherwise quantify the increase in production from its fuel." Mot. 10. Plaintiff avers that its mixtures were sold for use as a fuel, and remarks that IRS Notice 2006-92 provides that "[a] mixture is sold for use as a fuel if the producer sells the fuel and has reason to believe that the mixture will be used as a fuel by either the producer's buyer or any later buyer of the mixture." Mot. 10 (internal quotation marks omitted). Plaintiff correctly observes that although "used as a fuel" is not defined in the relevant statute (I.R.C. § 6426(e)), it is defined in IRS Notice 2006-92.[4]

---

[4] Plaintiff also relies on a proposed, but never finalized, regulation for the definition of "used as a fuel." As a general matter, proposed regulations have no legal effect until they are

However, plaintiff's statement that "the Court agreed [plaintiff] had 'reason to believe'" that its mixtures would be used as a fuel by its customers in the anaerobic digestion process, id., is patently false for three main reasons. First, plaintiff ignores that the court specified that "an alternative fuel mixture can be 'used as a fuel' in an anaerobic digester system." Alt. Carbon, 137 Fed. Cl. at 25 (emphasis added). That plaintiff's alternative fuel mixtures had the potential to be used as a fuel does not equate to the mixtures actually being used as a fuel or even a "reason to believe" that the mixtures would be so used. In any event, the court further specified that its determination regarding the potential of plaintiff's alternative fuel mixtures to be used as a fuel was "not the end of the inquiry." Id. Second, plaintiff's reliance on the court's statements that "plaintiff's alternative fuel mixtures were input into an anaerobic digester system, and the system produced electricity" and that "[t]here is no question that a substance used to produce electricity is used as a fuel," id., is taken out of context. In the same section of its summary judgment ruling that contained the aforementioned statements, the court also indicated that plaintiff's "alternative fuel mixtures were combined with other feedstock before being placed in the anaerobic digesters." Id. at 26. Thus, the "substance" used to produce electricity necessarily referred not to plaintiff's alternative fuel mixtures but to the aggregate mixtures input into the anaerobic digester system—i.e., plaintiff's alternative fuel mixtures when combined with other feedstock. Third, plaintiff fails to address the definition of "used as a fuel" contained in IRS Notice 2006-92. An alleged seller cannot logically have "reason to believe" that its products will be "used as a fuel" without knowing what "used as a fuel" entails.

Plaintiff avows that "the language of the statute itself must ordinarily be regarded as conclusive" and that "[courts] may not read ambiguity into a statute in order to reach a practical result." Mot. 10-11 (internal quotation marks omitted) (relying on Moosally v. Comm'r, 142 T.C. 183, 194-95 (2014)). However, as plaintiff remarks, "used as a fuel" is not defined in the relevant statute. Nor is "used as a fuel" defined in a relevant regulation. The only place "used as a fuel" is defined in any type of applicable authority is IRS Notice 2006-92. In other words, plaintiff has not shown that the court impermissibly read ambiguity into I.R.C. § 6426(e). The court simply applied the definition of "used as a fuel" contained in IRS Notice 2006-92—which is the same definition upon which plaintiff itself relies. See Alt. Carbon, 137 Fed. Cl. at 25 ("[A]n alternative fuel mixture is 'used as a fuel' when it is 'consumed in the production of energy.'" (quoting IRS Notice 2006-92)).

After quoting IRS Notice 2006-92 for the definition of "used as a fuel," the court then explained that the "'production of energy' requirement in the definition of 'used as a fuel' must necessarily refer to a net production of energy" by reviewing various sources to ensure that its reading of the requirements in I.R.C. § 6426(e) and IRS Notice 2006-92 was "consistent with the

---

finalized. Eustace v. Comm'r, 312 F.3d 905, 908 (7th Cir. 2002). But see Cinema '84 v. Comm'r, 294 F.3d 432, 438 (2d Cir. 2002) (explaining that temporary regulations have the same effect as final regulations pending promulgation of the final regulations). However, the definitions of "used as a fuel" and "sold for use as a fuel" contained in IRS Notice 2006-92 are identical to the definitions set forth in the proposed regulation cited by plaintiff. Compare IRS Notice 2006-92, § 2(f), 2006-2 C.B. 774, with Prop. Treas. Reg. § 48.6426-1(e), 73 Fed. Reg. 43,890, 43,898 (July 29, 2008).

purpose of the alternative fuel mixture credit." Id. (emphasis added) (relying on Haggar Co. v. Helvering, 308 U.S. 389, 394 (1940)). Thus, plaintiff's statement that the court "fail[ed] to consider IRS guidance from regulations, notices, and [private letter rulings] as well as the legislative history and congressional purpose behind alternative energy incentives," Mot. 7, is a gross mischaracterization of the summary judgment ruling. The court's interpretation of "used as a fuel" was necessary to avoid "defeat[ing] the purpose for which the credit was enacted," Alt. Carbon, 137 Fed. Cl. at 25. Rather than changing the statute's meaning, the court's interpretation was in harmony with the statute's purpose. See Bull v. United States, 479 F.3d 1365, 1376 (Fed. Cir. 2007) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect . . . ." (internal quotation marks omitted)). Indeed, plaintiff recognizes that "[courts] have no authority to modify a statute's unambiguous meaning" and "must give effect to the unambiguously expressed intent of Congress." Mot. 10-11 (internal quotation marks omitted) (relying on Moosally, 142 T.C. at 194-95).

Finally, the court concluded that because plaintiff's alternative fuel mixtures were combined with other feedstock before being placed in the anaerobic digester, plaintiff could not prove that its mixtures were the cause of any increased methane gas (and subsequent energy) production. The court also concluded that, in any event, the mixing of plaintiff's alternative fuel mixtures with other feedstock prevented plaintiff from being able to prove that the methane gas produced from its alternative fuel mixtures was not simply flared; the parties' experts agreed that methane gas that is flared is not "used as a fuel." Therefore, even if the court erred in construing the "used as a fuel" requirement, plaintiff could not prove any production of energy, much less a net production of energy.

In short, plaintiff has failed to show that the court erred in concluding plaintiff cannot prove that its alternative fuel mixtures were used as a fuel because plaintiff was unable to show a net production—or even any production—of energy from its mixtures.

**2. Excessive Claim Penalties**

In addition to arguing that the court erred in concluding that it was not entitled to the alternative fuel mixture credits that it claimed, plaintiff asserts that the court erred in concluding that it did not have reasonable cause for claiming the credits. As explained above, reasonable cause for claiming the credits obviates the excessive claim penalties. Plaintiff stresses that it had reasonable cause because it "rel[ied] on the advice of an IRS agent [and] IRS publications" and "rel[ied] on the advice of a competent tax professional." Id. at 12. Only plaintiff's reliance with respect to whether its alternative fuel mixtures were "sold" or "used as a fuel" is at issue since plaintiff satisfied the remaining elements for claiming the credits. Alt. Carbon, 137 Fed. Cl. at 32.

Plaintiff contends that the private letter rulings, a proposed regulation, the IRS's approval of plaintiff's registration, the August 2011 Chief Counsel Advisory, and Mr. Sanderson's phone conversation with an official in the IRS excise tax division constituted advice from the IRS upon which plaintiff could reasonably rely. However, the IRS did not provide any "advice" to

plaintiff for the reasons stated in the court's summary judgment ruling, which need not be repeated herein. See id. at 32-33, 35. The fact that plaintiff remained "anonymous" during Mr. Sanderson's phone conversation with the IRS official, Def.'s Resp. Pl.'s Mot. Stay Enforcement J. ("Resp.") App. 68, ECF No. 52-1, which fact was not before the court at the summary judgment stage, provides additional support for the court's conclusion.

To be sure, proposed regulations and private letter rulings (among other sources) constitute "authority for purposes of determining whether there is substantial authority for the tax treatment of an item."[5] Treas. Reg. § 1.6662-4(d)(3)(iii). However, "[t]he weight accorded an authority depends on its relevance and persuasiveness, and the type of document providing the authority." Id. § (d)(3)(ii). A private letter ruling "that is more than 10 years old generally is accorded very little weight." Id. (emphasis added). The private letter rulings upon which plaintiff purports to have relied were issued in 1992 and 1996, more than ten years before plaintiff began claiming the credits in 2011. Additionally, because the portion of the proposed regulation upon which plaintiff purports to have relied is identical to other authority upon which plaintiff also purports to have relied (i.e., a portion of IRS Notice 2006-92), the efficacy of the proposed regulation is irrelevant for purposes of determining the reasonableness of plaintiff's reliance thereon. In any event, the court distinguished the facts in the private letter rulings from the facts of the instant case and applied the definition of "used as a fuel" contained within IRS Notice 2006-92.

Further, plaintiff did not reasonably rely on advice from Mr. Sanderson with respect to whether its alternative fuel mixtures were "sold" or "used as a fuel" for the reasons stated in the court's summary judgment ruling. See Alt. Carbon, 137 Fed. Cl at 33-34 (advice from Mr. Sanderson regarding "sales"), 36-37 (advice from Mr. Sanderson regarding "used as a fuel"). Because plaintiff offers no new arguments in support of its position, the court need not revisit its prior conclusion.

In short, plaintiff has failed to show that the court erred in concluding that plaintiff did not reasonably rely on the advice of its advisers with respect to whether its transactions qualified as sales or whether its alternative fuel mixtures were actually used as a fuel.

**3. Summary**

Plaintiff has failed to show that the court erred in granting summary judgment in favor of defendant with respect to plaintiff's entitlement to the alternative fuel mixture credits. Plaintiff has similarly failed to show that the court erred in granting summary judgment in favor of defendant with respect to plaintiff's liability for the excessive claim penalties. Therefore,

---

[5] Notably, to the extent that plaintiff received oral advice from the IRS, such advice does not constitute "authority." See Treas. Reg. § 1.6662-4(d)(3)(iii) (as amended in 2003). "[L]egal opinions or opinions rendered by tax professionals" (written or otherwise) are similarly "not authority." Id. Taxpayers relying on such opinions may nevertheless have grounds for a reasonable-cause defense "if, under all the circumstances, such reliance was reasonable." Id. § 1.6664-4(b)(1).

although the court is mindful of the de novo standard of appellate review with respect to statutory construction and summary judgment, see Wells Fargo & Co. v. United States, 827 F.3d 1026, 1032 (Fed. Cir. 2016) (discussing the applicable standard of review); Golden Gate Rest. Ass'n v. City & County of San Francisco, 512 F.3d 1112, 1116 (9th Cir. 2008) (discussing the impact of the standard of review on the court's analysis of the first Hilton factor), plaintiff has not demonstrated a likelihood of success on the merits.

**B. Substantial Case**

A judgment debtor that fails to demonstrate a likelihood of success on the merits can nevertheless prevail on a motion to stay execution of a judgment pending appeal if it can show that it has a "substantial case on the merits, provided the other factors militate in the [applicant's] favor." Standard Havens, 897 F.2d at 513. A substantial case can arise "where the question raised is novel or close, especially when the case will be returned to the trial court should the movant succeed." Alaska Cent. Express, Inc. v. United States, 51 Fed. Cl. 227, 230 (2013). Plaintiff argues that it has demonstrated at least a substantial case because "the definitions of a 'sale' and 'use[d] as a fuel' have not been decided by the courts until this case" and that the "only guidance comes from IRS rulings and the legislative history." Mot. 15-16. On the other hand, defendant proffers that "plaintiff's motion fails to undermine the Court's [summary judgment] decision on any of the issues." Resp. 11, ECF No. 52.

The court agrees with defendant. In its summary judgment ruling, the court concluded that plaintiff did not sell its alternative fuel mixtures and that plaintiff could not prove that its alternative fuel mixtures were used as a fuel. Either of these reasons, standing alone, was sufficient for the court to grant summary judgment in favor of defendant with respect to plaintiff's entitlement to the alternative fuel mixture credits for 2011. Thus, even if the court erred in reaching one of these two conclusions, its grant of summary judgment would remain intact because the instant case does not present a "close call."

Similarly, plaintiff has failed to show a substantial case with respect to the excessive claim penalties. The court concluded that plaintiff did not reasonably rely on its advisers either with respect to whether its transactions constituted sales or whether its alternative fuel mixtures were used as a fuel. As explained above and in the court's summary judgment ruling, because plaintiff was not entitled to the credits as a result of failing both the "sales" and "used as fuel" requirements, its reliance needed to be reasonable in both respects to avoid application of the penalties.[6] Plaintiff has failed to demonstrate a substantial case regarding its reliance in either respect, let alone both of them together. As with plaintiff's entitlement to the credits, even if the court erred in reaching one of these two conclusions concerning the excessive claim penalties, the grant of summary judgment would remain intact and thus does not reflect a "close call."

---

[6] If plaintiff had failed to qualify for the alternative fuel mixture credits with respect to only one element, the only advice that would be at issue in evaluating the propriety of the excessive claim penalties would concern the failed element.

Plaintiff's reliance on Akima-Intra Data, among other decisions, for the proposition that "[a]n issue of first impression weighs in favor of finding a 'substantial case on the merits,'" 120 Fed. Cl. at 28, is unavailing. Although plaintiff is correct that there is a dearth of reported case law concerning the alternative fuel mixture credit, there have been myriad decisions concerning the economic substance doctrine and its application to tax credits. The court relied on many of these decisions, as well as other authorities, in concluding that plaintiff's transactions were not bona fide sales.[7]  Because that conclusion, standing alone, was sufficient to support the court's grant of summary judgment in favor of defendant with respect to plaintiff's entitlement to the credits, the lack of prior judicial rulings concerning the alternative fuel mixture credit does not create a novel question and thus fails to give rise to a substantial case.

In any event, beyond its statement that "appeals raising an issue of first impression also tip the first factor in favor of a stay," Mot. 15, plaintiff fails to articulate how the court erred beyond advancing the same arguments that were put forth during the summary judgment stage. Other courts have found that recycled arguments fail to demonstrate even a substantial case (which is sometimes referred to as a "substantial question"):

> In support of [their] position on this first factor [i.e., likelihood of success or substantial case], Plaintiffs repeat[] several arguments . . . that they raised when the Court addressed the underlying summary judgment motions. The Court considered these arguments and rejected them in reaching the decision that Plaintiffs are presently appealing. In reaching that decision, the Court thoroughly considered all of the arguments made in the extensive briefing . . . , and carefully reviewed the voluminous record. . . . The Court, therefore, finds that this first factor weighs against entering a stay.

Sanofi-Aventis U.S. LLC v. Sandoz, Inc., No. 07-2762, 2009 WL 1968900, at *2 (D.N.J. July 1, 2009); see also id. (describing "substantial question" as "the lesser of the two standards" relative to "likelihood of success"). In other words, plaintiff cannot, as it has attempted to do here, "create a showing of a substantial [case] by misquoting out of context parts of the [summary judgment ruling] and ignoring the fundamental analysis conducted therein." ePlus Inc. v. Lawson Software, Inc., 946 F. Supp. 2d 503, 509 (E.D. Va. 2013).

In short, plaintiff has failed to demonstrate even a substantial case, let alone a "fair chance" or likelihood of success on the merits.

---

[7] The parties did not dispute that plaintiff's transactions must constitute "sales" for plaintiff to qualify for the alternative fuel mixture credit. In other words, the parties disputed the fulfillment, not the applicability, of the "sales" requirement.

### C. Irreparable Harm

The second factor considers whether the judgment debtor will suffer irreparable harm absent a stay of execution of the judgment. An irreparable harm is present when "no amount of monetary damages, however great, could address the harm." Metalcraft of Mayville, Inc. v. Toro Co., 848 F.3d 1358, 1368 (Fed. Cir. 2018).

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time[,] and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Sampson v. Murray, 415 U.S. 61, 90 (1974) (internal quotation marks omitted); accord Sierra Military Health Servs., Inc. v. United States, 58 Fed. Cl. 573, 581-82 (2003) ("When assessing irreparable injury, the relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." (internal quotation marks omitted)).

In other words, irreparable harm is only present if the stay applicant "will be denied any meaningful relief if its motion is denied and it should ultimately prevail." Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381 (1997). As such, economic harm alone typically does not rise to the level of irreparable injury. Id. However, "economic loss that threatens the survival of a movant's business constitutes irreparable harm." Sierra Military Health, 58 Fed. Cl. at 582 (internal quotation marks omitted); accord Standard Havens, 897 F.2d at 516; see also Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").

Plaintiff declares that it has "no ability to post a bond pending appeal" for the judgment "or even a meaningful portion thereof" and that its "principals' other business endeavors would be destroyed by the [IRS] instigating litigation for collection while this matter is on appeal." Aff. James Huyser Supp. Mot. Stay Execution J. Pending Appeal ¶¶ 7, 10, ECF No. 48-1. Plaintiff contends that it "will be adversely and irreparably harmed" absent a stay because, without a stay, a business extinction will leave it with "no remedy" even if it ultimately prevails once the appeals process is completed. Id. ¶¶ 10-11.

Although it is not entirely clear, plaintiff's averment that its principals and their other businesses would be "destroyed" absent a stay appears to be an acknowledgement that those

individuals and entities are potentially liable for the $59.3 million judgment.[8,9] Because plaintiff has "ceased all operations and is no longer doing business" and "has no meaningful assets and has exhausted all of its funds in this litigation," id. ¶¶ 5-6, plaintiff itself is essentially judgment proof.  Any harm to plaintiff itself by execution of the judgment would be dubious if collection measures were indeed an exercise in futility; the only possible harm would be to plaintiff's principals and their other businesses.

Plaintiff's argument concerning the impact of execution of the judgment on its principals and their other businesses is both unsupported and wholly conclusory.  However, in an abundance of caution, the court assumes (without deciding) that at least one such business would be destroyed by efforts to collect on the judgment.  Such a business extinction would amount to irreparable harm because it could not be later ameliorated should plaintiff eventually succeed on appeal.  This factor therefore favors granting plaintiff's stay request.

### D. Substantial Injury to Other Parties

The third factor that the court must consider in determining whether to stay the execution of the judgment pending appeal is "whether issuance of the stay will substantially injure the other parties interested in the proceeding." Hilton, 481 U.S. at 776, quoted in Standard Havens, 897 F.2d at 512.

Plaintiff avers that defendant will not be harmed by the issuance of a stay because "[t]he IRS has already assessed both the credits and the penalties against [plaintiff], and thus it is protected in the event that the Federal Circuit affirms the judgment," and because defendant "will still have the same means for executing the judgment available to it following resolution of the appeal." Mot. 17-18.  Meanwhile, defendant avers that "delayed collection only harms [its] and the public's interest in collecting taxpayer dollars and associated penalties" because "collection efforts . . . will be challenging and complex." Resp. 12.

---

[8] For example, plaintiff's principals (and, by extension, their other businesses) could be secondarily liable by operation of state law, see, e.g., United States v. Galletti, 541 U.S. 114, 116 (2004), or pursuant to plaintiff's operating agreement.  Plaintiff's principals and their other businesses might also be liable by disregarding their separate existences under the alter ego doctrine.  See, e.g., Wechsler v. Macke Int'l Trade, Inc., 486 F.3d 1286, 1295 (Fed. Cir. 2007); W. Mgmt., Inc. v. United States, 101 Fed. Cl. 105, 117-18 (2011).  However, the identity of the ultimate obligors of plaintiff's tax debt is not an issue before the court.  Indeed, that issue is properly suited for a collection action in federal district court.  See I.R.C. § 7403(a) (2012).

[9] Beyond the $59.3 million principal amount, the judgment also includes "statutory interest and additions according to law." Am. J.  See, e.g., I.R.C. § 6601(a).

Defendant urges the court to analyze plaintiff's stay request under criteria used by other courts as outlined in Dillon. In Dillon, the court explained that in "determining whether to waive the posting of bond, [courts] may look to several criteria":

> (1) the complexity of the collection process;
>
> (2) the amount of time required to obtain a judgment after it is affirmed on appeal;
>
> (3) the degree of confidence that the [trial] court has in the availability of funds to pay the judgment;
>
> (4) whether the [judgment debtor's] ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and
>
> (5) whether the [judgment debtor] is in such a precarious financial situation that the requirement to post a bond would place other creditors of the [judgment debtor] in an insecure position.

866 F.2d at 904-05 (citations and internal quotation marks omitted). Although the Dillon criteria are binding in the Seventh Circuit and have been used by courts throughout the nation to determine whether a bond is necessary, they are most appropriately analyzed in this court under the third Hilton and Standard Havens factor—substantial injury to other interested parties—since they concern the balance of harms.[10]

In its discussion of the first Dillon criterion, defendant supports its assertion that "the collection effort will be time-consuming and challenging," Resp. 6, by describing the difficulty in collecting on assets distributed from plaintiff to its principals and highlighting portions of deposition transcripts and other materials attached to its response. Defendant also remarks that plaintiff has "failed to show how waiver [of the requirement to post a bond to stay execution of the judgment] would not impair collection efforts" and thus is not entitled to a stay. Id. at 7.

The second Dillon criterion favors granting a stay if the applicant shows that it can quickly satisfy the judgment if it is upheld on appeal, but the criterion weighs against granting a stay when collection will be lengthy and cumbersome. Compare Dillon, 866 F.2d at 905 (providing a "strong case in favor of staying the execution of the judgment" when the judgment debtor had a procedure in place for paying the judgment within thirty days, more than adequate funds, and a track record of prompt payments of similar judgments), with Lightfoot, 797 F.2d at 506-07 (rejecting a stay application where, despite the judgment debtor having the ability to pay

[10] Indeed, even courts in the Seventh Circuit considering stay applications must ultimately "decide whether the [judgment debtor] is likely to prevail on the merits of the appeal and whether the harm to the [judgment creditor] from granting the stay would exceed the harm to the [judgment debtor] from denying it." Lightfoot, 797 F.2d at 507.

the judgment, the process was "not only cumbersome and time-consuming, but uncertain in outcome"). In the instant case, plaintiff's balance sheet shows that, as of December 31, 2012, it had only $21,502.44 in cash on hand and a net worth of $25,902.44. Resp. App. 36. Further, plaintiff avers that it has "exhausted all of its funds in this litigation." Mot. 16.

The third and fourth Dillon criteria are straightforward and, given the parties' agreement that plaintiff is effectively defunct, bear scant need for discussion. Assuming that the premium for a supersedeas bond costs 1% of the bonded amount, see, e.g., Metso Minerals Inc. v. Terex Corp., 594 F. App'x 649, 650 (Fed. Cir. 2014) (unpublished decision) (reflecting a $500,000 premium cost for a $50 million bond), the cost of a supersedeas bond for the full amount of the judgment would be nearly $600,000, and the cost of a bond for only the credits portion of the judgment would be approximately $200,000. In addition to the premium cost for a supersedeas bond, sureties generally "require the judgment debtor to provide collateral to secure all or at least a substantial portion of the amount of the bond." Thomas H. Boyd & Kelsey L. Fuller, Stay of Judgments and Orders Pending Appeal: Supersedeas Bonds and Other Forms of Security, For the Def., Feb. 2018, at 16. Even for a supersedeas bond covering only the credits portion of the judgment, the cost far exceeds plaintiff's currently available assets.

In the instant case, the court's evaluation of the Dillon criteria demonstrate that defendant would be harmed by a stay of execution of the judgment pending appeal because plaintiff has failed to show an ability to pay the judgment and because collection efforts will likely involve an extended, arduous undertaking.[11] That the IRS "has already issued its assessments" against plaintiff, Mot. 18, is of no moment, because a stay would prevent the IRS from moving forward with collection efforts while plaintiff's appeal is pending.

The IRS issued the relevant assessments against plaintiff on April 18, 2014. Alt. Carbon, 137 Fed. Cl. at 19-20. The I.R.C. provides a ten-year window after assessment in which court proceedings for collection may be commenced.[12] I.R.C. § 6502(a); Treas. Reg. § 301.6502-1(a). Accordingly, defendant must institute a collection action in federal district court no later than April 18, 2024. Cf. Galletti, 541 U.S. at 116 (explaining that an assessment against a partnership extends the statute of limitations on collection against "the partnership itself or from those liable for its debts"). Nearly half of the ten-year period has already passed, and even though plaintiff is unlikely to succeed on appeal, the length of future proceedings is unpredictable.[13] Further, there

---

[11] Since plaintiff is no longer actively operating, it does not appear to have creditors beyond defendant. Accordingly, the fifth Dillon criterion does not apply.

[12] Once the court proceeding has begun, the limitations period on collection continues to run until the judgment "is satisfied or becomes unenforceable." I.R.C. § 6502(a); accord Treas. Reg. § 301.6502-1(c). In addition, certain scenarios toll the statute of limitations on collection. See generally I.R.C. § 6503.

[13] Over three years elapsed between the date plaintiff filed its complaint in the instant case and the date the court issued its summary judgment ruling.

is no evidence before the court to suggest that plaintiff has agreed to extend the statute of limitations on collection.

In short, defendant will be harmed by being prevented from moving forward with collection efforts while plaintiff's appeal is pending. The court recognizes, however, that the extent of such harm is difficult to gauge because, given plaintiff's financial condition, the success of any collection efforts (now or in the future) is uncertain. The third factor therefore weighs, albeit slightly, in favor of denying plaintiff's motion to stay execution of the judgment pending appeal.

**E. Public Interest**

The fourth and final Hilton and Standard Havens factor concerns the public interest. However, the third and fourth factors, i.e., "assessing the harm to the opposing party and weighing the public interest, . . . merge when the Government is the opposing party." Nken, 556 U.S. at 435. Therefore, the court need not separately address this factor.

**F. Balancing of the Factors**

Having considered each of the factors applicable to a stay of execution of the judgment pending appeal, the court must weigh the factors against one another. See Standard Havens, 897 F.2d at 513. Without demonstrating a "strong" likelihood of success on appeal, a stay pending appeal is appropriate when the applicant presents a substantial case and the balance of hardships tips in its favor. Id.; Alaska Cent. Express, 51 Fed. Cl. at 230. The proposition that a stay applicant can succeed by "show[ing] the presence of substantial issues and that the other three factors of the Hilton [and Standard Havens] analysis militate in [its] favor," ePlus, 946 F. Supp. 2d at 509, is well settled.

In Par Pharmaceuticals, Inc. v. TWI Pharmaceuticals, Inc., for instance, the stay applicant failed to demonstrate a "strong" likelihood of success on appeal, but the "showing of a substantial case" in light of the de novo standard of review and the trial court's decision being a "close call" was sufficient for the trial court to grant a stay pending appeal because "the balance of hardships tip[ped] strongly in [the applicant's] favor." Civil No. CCB-11-2466, 2014 WL 3956024, at *2 (D. Md. Aug. 12, 2014) (emphasis added). The trial court determined that the balance of hardships weighed strongly towards the plaintiff because it would have suffered "structural harm" in the absence of a stay that could not later be remedied, whereas the defendant would have merely "suffer[ed] delayed revenue that it [could] recover through damages" if a stay was entered and the decision was upheld on appeal, particularly given that "some of its harms [were] self-inflicted." Id. at *5.

In the instant case, plaintiff asserts that it will suffer irreparable harm absent a stay of execution of the judgment pending appeal because its principals' other businesses will be destroyed by IRS collection efforts—an injury that cannot be remedied by a later favorable ruling. Although plaintiff's assertion is unsubstantiated because it is based on an affidavit containing only gratuitous allegations, the court nevertheless gives plaintiff the benefit of the

doubt and (for sake of argument only) credits plaintiff's contentions regarding irreparable harm. Meanwhile, the harm to defendant—which, in the instant case, merges with the public interest—should a stay be entered is difficult to assess, but in any event will not threaten defendant's overall viability. At most, defendant will suffer delayed or reduced collection, and the I.R.C. provides compensation for delayed payment by requiring additional interest. Thus, as in Par Pharmaceuticals, because the potential harm to plaintiff could be business extinction while defendant will suffer, at most, delayed or reduced collection, the balance of harms appears to weigh in plaintiff's favor.

However, as explained above, finding that the balance of harms weighs in the applicant's favor, standing alone, is insufficient to support staying execution of a judgment pending appeal. See, e.g., Curry v. Baker, 479 U.S. 1301, 1302 (1986) (declining to enter a stay despite there being "no doubt" that the applicant would suffer irreparable injury). After all, the "sine qua non of the stay pending appeal standard is whether the movant[ is] likely to succeed on the merits," Acevedo-Garcia v. Vera-Monroig, 296 F.3d 13, 16 (1st Cir. 2002) (internal quotation marks and alternations omitted), which plaintiff has failed to demonstrate. In fact, when the balance of harms is favorable to a stay applicant, a substantial case may be sufficient for the court to enter a stay. In other words, the first factor—likelihood of success or, at a minimum, substantial case—is essential. Unfortunately for plaintiff, it has not demonstrated even a substantial case. See supra Section III.B. Although the Federal Circuit will review the court's summary judgment ruling de novo, this case does not present a close call because there were multiple independent reasons supporting the court's ruling. Since more than a "mere possibility of relief" on appeal is required, Nken, 556 U.S. at 434, the first factor cuts squarely and definitively against plaintiff.

In short, the court assumes that the balance of harms weighs in plaintiff's favor. However, plaintiff has failed to demonstrate a likelihood of success on the merits of its appeal or even a substantial case. Therefore, plaintiff is not entitled to the requested stay.

## IV. CONCLUSION

The court has considered all of the parties' arguments. To the extent not discussed herein, they are unpersuasive, without merit, or immaterial.

For the reasons stated above, the court **DENIES** plaintiff's motion.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge